James R. LASETER, Appellant,

v.

PET DAIRY PRODUCTS CO., a corporation, Appellee.

No. 7403.

United States Court of Appeals Fourth Circuit.

Argued May 29, 1957.

Decided July 29, 1957.

W. Ray Berry, Columbia, S. C., and J Roy Berry, Edgefield, S. C., (Edgar L. Morris, Columbia, S. C., on the brief), for appellant.

James F. Dreher, Columbia, S. C., (David W. Robinson, Columbia, S. C., and S. J. Milligan, Greenville, Tenn., on the brief), for appellee.

Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This action is founded upon a claimed contract of employment by virtue of which the plaintiff claims he was promised, but refused, "light work." At the conclusion of the plaintiff's testimony,

the District Court dismissed the action pursuant to Rule 41 of the Rules of Civil Procedure, 28 U.S.C.A., upon the ground that the plaintiff had shown no right to relief.

The plaintiff was first employed by the defendant in April 1951. During most of the period of his employment his work was that of a route salesman delivering milk and other products of the defendant.

In 1953 he underwent an operation upon his back for an ailment diagnosed as a ruptured or herniated disk. After approximately ninety days, during which time he was paid full compensation by the employer, he returned to work and resumed his job as a route salesman. In October 1954 he again underwent a similar operation upon his back, by reason of which he was again incapacitated for approximately ninety days, again being paid his full compensation. After the second operation he resumed his duties as a route salesman on January 13, 1955, but was again hospitalized on February 25, 1955, and underwent a third operation on his back on March 2nd. He was again paid his full compensation for three months following the date of hospitalization, or until May 24, 1955, pursuant to the requirements of Section 2 of Article 6 of a contract between the employer and The Milk and Ice Cream Drivers and Dairy Employees, Local Union No. 23.

In addition to payment of compensation for the three months period by the employer, the employee also received weekly compensation with medical expense, under a group insurance policy restricted to compensation for injuries and illnesses unconnected with his employment. Subsequently he also claimed benefits under the South Carolina Workmen's Compensation Act, Code 1952, § 72-1 et seq. under the theory that his injury occurred in the course of his employment, and he received an award under that Act.

The contract between the employer and the Union is a very comprehensive one. It recognizes the Union as the exclusive bargaining representative of all employees with "respect to rates of pay, hours of work, working conditions, dismissals and discriminations," and prohibits any bargaining by the company with any other union, individual, or groups of individuals. It expressly prohibits any verbal or written contract with any employee in conflict with the agreement. It sets up in detail the method by which grievances shall be handled. If unresolved, they are required to be submitted to arbitration.

As indicated above, among other things, it requires the employer to pay each employee absent from work as a result of sickness or injury, whether on or off the job, his full compensation for a period not exceeding three months.

The Union contract contains detailed seniority provisions and specific provisions for "posting" any open route, so that other employees, on the basis of seniority, may "bid" for it.

Finally, among provisions of the Union contract pertinent here, is a provision of Section 9, Article 8, that the company shall not be required to employ or to retain in its employment anyone physically unfit "provided, however, that, if the employee's condition is such that he is acceptable and able to do some work in the plant, such work shall be given to him as far as it is practicable and his wages adjusted accordingly."

The employee testified that sometime in May 1955 he was visited in his home by the employer's personnel manager, who assured him that the company was going to take care of him, and that, in reliance upon this promise, he consented that his route be "posted," in order to permit other employees to "bid" upon it and the senior of them to take it over. It is conceded, however, that the employer had the right to "post the route" at any time after the employee's hospitalization, and that he was physically incapable of handling the job even as late as August 1955.

The employee also testified that the Plant Manager told him he would be given light work when his doctor certi-

fied he was physically capable of performing it.

In July 1955, the employee obtained a letter from his doctor expressing the opinion that his recovery was sufficient to permit him to do "light office work." With this letter, the employee reported for work on July 18, 1955.

Meanwhile there had been some discussions between representatives of the employer and representatives of the Union, during which, according to the testimony of the Shop Steward, he objected to the placement of the employee in the office on the ground of personal animosity between the employee and another employee in the office of the employer. Additionally, it appears that the employee had only a sixth grade education and, while the Shop Steward stated that, in his opinion, additional help could be used in the office, there was no existing job then open in the office.

Representatives of the employer and the Union had also discussed the possibility that the employee might be put to work loading empty crates upon a conveyor for washing. At the time no one was employed for that purpose, the loading of the crates upon the conveyor being done by other employees incident to other duties or in their spare time. We are not informed of the weight of the empty crates, but the operation was a manual one requiring lifting rather than "light office work" within the certification of the employee's doctor.

The employee testified that when he reported for work on July 18th he was told by one of the plant officials that they would give him work loading the empty crates upon the conveyor if he would sign a release. While the release was not made a part of the record and its purpose is not certain, the employee testified that it covered all past, present and future claims he might have against the employer and that he refused to sign it. The plant official did not put him to work. The employee, however, continued until August 3rd to report each day asking for work, but was told on each occasion there was none available. Upon inquiry, he had been told he was not discharged, but on August 3, 1955, following a conversation regarding his smoking in the lavatory, he was asked not to return to the premises.

Subsequently he obtained other, more profitable, employment.

The employee testified that he did not know what rate would be applicable to the job of loading empty crates on the conveyor, but he thought it would be between $1.05 and $1.10 an hour. He did not know how many hours of work per day or per week the operation would require and was unable to estimate what his weekly compensation would have been had the job of performing this operation been created and assigned to him. There is no other evidence in the record from which the court can determine, or even speculate, as to the hours of employment or the duration of what the plaintiff claims was his promised employment.

In dismissing the jury and granting the motion of dismissal under Rule 41, upon this showing, we think the District Judge was entirely correct.

■ In assuring the employee that they would take care of him and would give him light work when his doctor would certify that he was capable of performing it, officials of the employer were recognizing their obligation under Section 9 of Article 8 of the contract with the Union and expressing their intention to comply with it. Under the circumstances, such expression of intention to comply with their established obligations is natural, but should not be construed as an offer to enter into a separate and special contract of employment. The fact that the assurances were general, not specific, particularly in the light of the provisions in the contract with the Union prohibiting individual bargaining, lends great weight to this conclusion.

Should we assume that there was an intention to enter into a separate and special contract of employment, as the employee would have us do, he is still met with insurmountable obstacles.

If the intention to enter into a contract of employment was clear, we should be reluctant to hold the contract too indefinite to be enforceable. The assurances here, however, contain none of the essential terms of an employment contract. No specific job was mentioned, nor was there any discussion of rates of pay, hours of employment or its duration. We cannot supply these terms by reference to other jobs for the record does not show that there was any existing job in the plant which the employee was capable of performing. His limited education and the objections of his Shop Steward indicate his lack of qualification for office work, while the certification of his own physician indicates that in July 1955 he was physically incapable of performing any other work.

Indeed, the employee does not claim that he was capable of performing any existing job, or that any such job was promised. His claim, based upon the conditional discussion when he reported for work on July 18, 1955, is that a job of loading empty crates upon the conveyor going to the washer should have been created and given to him. He guessed that the rate for such a job would be between $1.05 and $1.10 an hour but he did not testify there was any discussion of it. It is possible that the loading of empty crates would be done only in the afternoon when the delivery trucks with empty crates returned to the plant and would require but a short time for its performance, but the silent record gives us nothing upon which we can even speculate as to the number of hours per day or per week the performance of this operation would require.

■ The Court cannot write a contract for the parties. When the parties have not, expressly or by implication, agreed upon essential terms of a contract, the Court cannot supply them. As Professor Williston says:

"It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning." 1 Williston on Contracts, Revised Edition, § 37, page 98.

" * * * So, * * * (a promise) 'to give employment' without specifying its nature or compensation * * * (is) too vague." 1 Williston on Contracts, Revised Edition, § 42, pages 120–121.

See also, Anderson v. Hall, 155 S.C. 320, 152 S.E. 521; McLaurin v. Hamer, 165 S.C. 411, 164 S.E. 2; Seiss v. McClintic-Marshall Corp., 324 Pa. 201, 188 A. 109; 1 Restatement of the Law, Contracts, § 32.

■ In view of our conclusion that the claimed special contract of employment is too indefinite to be enforced, we do not reach the numerous other objections to its enforcement.[1]

The employee contends that he is entitled to relief here under the provisions of Article 8, Section 9, of the collective bargaining agreement.[2] As indicated above, however, he failed to prove that he was acceptable and able to do some work in the plant and that it was practicable to give him such work within the meaning of that section.

The order dismissing the action under Rule 41 was clearly appropriate and proper.

Affirmed.

1. Among them are the objections that the claimed special contract is invalid under the provisions of the collective bargaining agreement and that the employee's consent to the posting of his route does not constitute a legal consideration for the claimed promise of employment since, as counsel for the employee frankly conceded, the employer had the right to post the route without such consent.

2. If there was a violation of that agreement, his remedy was to file and prosecute a grievance under the grievance and arbitration procedures of the contract. He claimed no grievance.