Alvin HIGGINS, Gerald Briggs, Wesley Banks, Christopher Ledford, Carmel Burleson, and John Conley, Plaintiffs–Appellees,

v.

OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, LOCAL # 3–677, Defendant–Appellant.

Supreme Court of Tennessee,
at Knoxville.

June 3, 1991.

Judith Fain, Erwin, for plaintiffs-appellees.

Cecil D. Branstetter, Branch H. Henard, III, Nashville, Michael J. Davenport, Johnson City, for defendant-appellant.

OPINION

DAUGHTREY, Justice.

This lawsuit involves an action in contract, brought by six former employees of Nuclear Fuel Services Company (NFS) against their union, the Oil, Chemical and

Atomic Workers International Union, Local # 3–677 (the OCAW).[1] The discharged workers alleged in their complaint that, based on an agreement with the OCAW, they were entitled to receive weekly compensation from the union in an amount equal to their lost wages, plus insurance coverage for themselves and their families, "until [they] were allowed or could return to work" at NFS. They further alleged that the union had breached this contract by discontinuing weekly payments while they were still unemployed.

The OCAW denied that there was ever an enforceable contract between the union and the discharged workers, although the union concededly had made weekly payments to the plaintiffs for some 22 months, in an amount totalling over $300,000. The disputed question, therefore, is whether and under what circumstances the OCAW was entitled to terminate these payments.

The chancellor held that there was a valid contract between the parties. The chancellor also found that the union had breached the contract and ordered the union to resume payments to the discharged workers under terms outlined below. On appeal from the trial court, the Court of Appeals likewise concluded that there was an enforceable contract, but it expanded the terms of the judgment against the union.

The OCAW now appeals the decision of the Court of Appeals, contending among other things[2] that there was no valid contract because there was no mutual assent between the parties. We agree and we therefore reverse the judgment entered below.

## I.  FACTUAL BACKGROUND

The dispute in this case arose from a strike initiated by the local union against the company in May 1985, after negotiations on a new collective bargaining agreement were unsuccessful. The strike was a long and bitter one, continuing until March 1986, when a new contract was finally negotiated. During the course of the strike, certain picket line violence occurred, which the company blamed on seven of the striking workers. Final resolution of the strike was held up when NFS flatly refused to rehire these seven workers, including the six original plaintiffs in this case.

In the meantime, the other striking workers had become disgruntled and wanted to return to work. Union leaders were also interested in ending the strike quickly, because there was talk of a possible union decertification vote that would have the effect of costing all the striking workers their jobs.

The union negotiating team, consisting of the officers of the local union and a representative of the international union, met secretly with the plaintiffs in an effort to gain their approval of the proposed contract, which was then in the final stages of negotiation. At this meeting, on March 16, 1986, the committee proposed to the plaintiffs that local union dues would be increased in an amount sufficient to pay them their wages and insurance until such time as they were able to return to work.[3] Plaintiffs later claimed that in return they promised to remain silent at the upcoming union meeting and not to object to ratification of the proposed contract with

1. The original defendants included the local officers of OCAW and the International. The action as to them was dismissed by the trial court. That ruling was affirmed by the Court of Appeals and is not before us. The chancellor also dismissed one of the six plaintiffs for failure to prosecute. A seventh worker apparently abandoned his claim when he was reemployed soon after the strike in this case was settled.

2. The union, as appellant in this court, argues two other grounds, both directed at establishing that there was no consideration for the contract alleged in this case. We find it unnecessary to reach the issue of consideration, in view of our ruling on the issue of mutual assent. The final question, involving pre-emption by federal law, was not raised below and is not properly before us for review.

3. One of the workers questioned the union's good faith in making this commitment and was told in response about a case in which a union member had been paid for the entire seven years that it took to achieve his reinstatement through negotiation and arbitration. However, there were no specific promises about how long payment to these plaintiffs would continue.

NFS, even though it did not provide for their reemployment. However, the record indicates that at least two and possibly three or more of the plaintiffs did, in fact, oppose settlement of the strike at the later union meeting on March 30.

The business proceedings at the March 30 meeting were tape-recorded, and both the recording and a transcript of it were introduced at trial. The transcript indicates that the following motion was made by one of the union officers:

"Mr. Chairman, at this time I'd like to make a motion that in the event this contract is voted on, that we raise union dues in order to take care of these seven people on their regular wages plus insurance til they're back in the plant."

After this motion was seconded, a series of questions followed, all of them indicating confusion on the part of the union members as to the substance and effect of the motion.

Not surprisingly, the first question raised concerned the amount of the dues check-off that would be necessary to "take care of the seven." The presiding officer responded:

"Well, I'd say probably right now we're looking roughly at probably $50.00 or $60.00 [per month].... Now, you're looking at maybe—what we're going to do, we're going to speed this thing into arbitration. You may be looking at within two weeks, but the thing about it is, everybody won't be going back at the same time. They [the seven discharged workers] may be back before we get back to work."

The next question was whether the discharged workers' return to work would reduce the dues check-off. The chair, Mr. Tolley, responded:

"Yes, definitely. If we put all five—if we put the first five back the first week, then it would be dropped down as it goes in until they all go back. This is only to take care of the seven people."

Tolley then explained that the union expected not only to achieve reinstatement for the seven, but also to secure back pay for them, leaving an implication that the mon-

ey advanced through the dues check-off would ultimately be returned to the membership.

When a union member asked from the floor to hear from the discharged workers, he was told by Tolley:

"We've talked to the seven people ... [They] are in agreement ... to stay out and take their chances under these conditions with arbitration."

Tolley and the International representative, Larry Able, then reassured the crowd that arbitration would be successful, pointing out, for example, that "it's very rare that you see any person lose his job as far as picket line violence. Most arbitrators are real easy because, what it is, [they know that the workers are just] out fighting to try to protect their jobs."

There is no doubt that there was considerable confusion among the members who attended the March 30, 1986, meeting. At one point, someone in the back of the hall shouted that they "didn't hear the proposal back here." In response, Mr. Tolley attempted to restate the original motion, but he did so in an obviously oversimplified fashion, saying, "The proposal was that we raise dues enough to take care of these people." There was no explanation about how long this might take, although there were additional assurances given that arbitration would be sought and that the international union would supply "the best representation ... the best lawyers that we can get" for the seven discharged members.

Given the tenor of statements made by those in charge of the meeting and the general level of confusion that prevailed, it is not surprising that some of the members who were present later testified at trial that they thought the increase in dues would last only two or three weeks, but in no event longer than "a couple of months." There is nothing in the record to indicate any intention to make payments in lieu of wages on a perpetual basis, other than the wording of the original motion calling for "wages plus insurance 'til they're back in the plant." As the chancellor later noted, however, to give literal effect to this provi-

sion would make the contract "void due to impossibility of performance," because performance would be wholly contingent on the action of a third party, the company, which might refuse to accept the discharged workers and then be vindicated in its position by the arbitrators.

In any event, the record indicates that the motion to "take care of the seven" carried by a vote of 274 to 29, and the new collective bargaining agreement was ratified by the union membership at the same meeting. Of the original six plaintiffs in this case, one was quickly rehired. A second pursued arbitration unsuccessfully and was not. Arbitration in the other four cases dragged out over many months, until finally, on February 10, 1988, the local union membership voted to terminate the remaining dues check-off used to fund the weekly payments. This lawsuit followed, based on the plaintiffs' claim that they had a valid contract that was breached by the union's termination of payments in February 1988, and that they are entitled to payments from that date "at least through the term of the [three-year] contract which was negotiated between the union and the management of Nuclear Fuel Services ... in March or April of 1986."

## II. THE RULINGS BELOW

The chancellor noted that in its answer to the complaint, the union had denied the existence of a valid contract. The chancellor held that this issue had been waived, however, based on what we take to be an erroneous conclusion that "[d]uring the trial the parties failed to address the contract issue...."[4] The chancellor, having assumed the existence of a contract, went on to find that it had been breached and awarded the plaintiffs "their wages and insurance from the date of the termination of their benefits on February 1, 1988, until their cases are arbitrated or legally termi-

nated, or until the end of the contract between the union and the company, whichever shall first occur." As noted above, the chancellor declined to give literal effect to the alleged promise to pay the plaintiffs until they actually returned to work, on the ground that performance based on such a contingency would make the contract void for impossibility of performance.

Finding that the contingency in question was one "which [could] have been foreseen and provided against," the Court of Appeals expanded the relief granted beyond that originally sought in the complaint, holding that regardless of the outcome of arbitration, the plaintiffs "are entitled to have the payments continued until they return to work at the plant or reach age 62...." The intermediate court managed to fill in some of the remaining gaps in the "contract" by providing that the payments to the plaintiffs "would, of course, terminate prior thereto upon their death, the plant closing because of fire or other reasons, or their being physically or mentally unable to perform the services required by Nuclear Fuel Services." The court also imposed upon the plaintiffs the equitable obligation "in good faith [to] seek employment elsewhere," provided that the union should be given "credit for such emoluments as they [the plaintiffs] may receive."

It is apparent from this summary of the judgments entered below that, faced with a vague and indefinite agreement, the chancellor and the appeals court undertook, in effect, to write a contract for the parties. This, of course, the law does not permit courts to do. *Central Adjustment Bureau, Inc., v. Ingram,* 678 S.W.2d 28 (Tenn. 1984); *Petty v. Sloan,* 197 Tenn. 630, 277 S.W.2d 355 (1955); *Central Drug Store v. Adams,* 184 Tenn. 541, 201 S.W.2d 682 (1947). Because we conclude that the proof shows unequivocally that an enforce-

---

4. The defendant presented the testimony of several witnesses to substantiate its position that no promise had been made at the secret meeting to pay the plaintiffs indefinitely and that the union members who attended the March 30 meeting thought that their dues would be increased for no more than two or three months. No closing arguments were made at trial, although counsel was given an opportunity to file a brief in lieu of final argument. Apparently, only plaintiffs' counsel took advantage of this opportunity, but we do not think it is fair to conclude from defense counsel's failure to file an additional brief that the defendant had abandoned its contention that no contract existed between the parties.

able contract never came into existence, we reverse the judgments of the two lower courts in favor of the plaintiffs and enter judgment instead for the defendant.

### III. LACK OF MUTUAL ASSENT

■ The requirements for a valid contract are well-settled:

> While a contract may be either expressed or implied, or written or oral, it must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.

*Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 34–5, 356 S.W.2d 277, 281 (1962), citing *American Lead Pencil Co. v. Nashville, Chattanooga and St. Louis Ry. Co.*, 124 Tenn. 57, 134 S.W. 613, 613 (1911). The facts of this case, plainly and simply, fail to establish mutual assent. Hence, no contract between the parties ever arose.

The record establishes that the only thing on which both sides agreed was that the seven discharged workers would be "taken care of" through the payment of an amount equal to their wages and insurance premiums. The duration of payment was not specified. The plaintiffs testified that, based on the discussion at the secret meeting on March 16, they understood that the union was obligated to pay them until they were rehired, however long that took. Nevertheless, the plaintiffs admitted at trial that they knew that the assurances presented to them at the secret meeting were contingent upon a later vote by the union membership to increase dues. Hence, no contract arose as a result of the secret meeting on March 16, because under federal law the negotiating team was not authorized to bind the union membership to an increase in dues, and the plaintiffs concede that they knew this fact. *See* 29 U.S.C. § 501(a).

■ The terms of the informal agreement reached at the secret meeting were not fully explained to the union membership at the meeting on March 30. As a result, those terms cannot be enforced against the union, unless ratified by the membership. *Cf. Arkansas Dailies Inc. v. Dan*, 36 Tenn.App. 663, 260 S.W.2d 200 (1953); *W.W. Dillon & Co. v. Sharber*, 19 Tenn.App. 488, 90 S.W.2d 533 (1935). It is true that the original motion at the union meeting was phrased in terms of continuing payment " 'til they're back in the plant." It is also true, however, that this proposal was sufficiently indefinite to cause an immediate request for clarification. Moreover, the only explanation concerning the extent of this otherwise vague obligation was phrased in terms of a dues increase lasting no more than a few weeks or months. Furthermore, the motion as restated midway through the discussion contained no commitment as to duration of the payments, but spoke only in terms of "taking care" of the discharged workers.

Under these circumstances, we can only conclude that there was no mutuality of assent by the parties concerning performance. In reaching this conclusion, we recognize that the courts have gradually shifted from a subjective to an objective standard of intent in determining enforceability. *See generally* 1 S. Williston, *A Treatise on the Law on Contracts* § 21 (1963) [hereinafter *Williston*], recommending the use of an objective test to determine mutual assent, rather than the outdated "meeting of the minds" theory. Even so, it may be necessary to look beyond the words themselves to assess the parties' intent. As one prominent federal court has noted in adhering to the objective standard:

> It is quite true that contracts depend upon the meaning which the law imputes to the utterances, not what the parties actually intended; but, in ascertaining what meaning to impute, the circumstances in which the words are used is always relevant, and usually indispensable. The standard is what a normally constituted person would have understood them to mean, when used in their actual setting.

*New York Trust Co. v. Island Oil and Transport Corporation*, 34 F.2d 655, 656 (2nd Cir.1929). Moreover, as Professor Williston indicates, even using the objective

standard to determine mutuality of assent, "there are a number of instances when the subjective intention of the parties may be decisive." 1 *Williston* § 21.

In this case, the Court of Appeals apparently took the language of the original motion at face value and imposed an obligation on the union to pay the discharged workers indefinitely. Such a thoroughly objective approach may be appropriate in dealing with written contracts, especially in a commercial context. However, the intermediate court's literal interpretation of the motion in this case fails to take into account the circumstances of its adoption, especially the assurances given the ratifiers that their financial obligation, while indefinite, would be merely temporary and would hinge on progress made in arbitration. The chancellor's order comes closer to full recognition of the context of the commitment made by the union on March 30. What it fails to take into account is the plaintiffs' insistence that the union is bound by assurances purportedly made by the negotiating team at the earlier meeting.

Taking all the circumstances into account, we conclude that the plaintiffs have failed to establish the degree of mutual assent necessary to give rise to a valid contract. Indeed, the facts of this case raise a legitimate question as to whether the parties intended legal consequences at all. It follows that payments made as a result of the union's commitment to support the discharged workers, based on the action of the membership on March 30, were merely a gratuity, and that no liability arose from the termination of those payments in February 1988.

## IV. INDEFINITENESS OF THE AGREEMENT

■ Even if mutuality could be inferred from the separate events of March 16 and March 30, 1986, the resulting contract would not be enforceable.

It is undisputed that the union membership committed itself to "take care of" the discharged employees and that it did so for almost two years at considerable expense to the individual members. However, not every statement of intent of the kind made by the union in this case will rise to the level of an enforceable agreement. *See, e.g., Soar v. National Football League Players' Ass'n*, 550 F.2d 1287 (1st Cir. 1977), in which the court declined to enforce an oral promise by the NFL Commissioner that retroactive benefits would be provided to retired NFL players who were not covered under a recently approved pension plan. As the court noted in *Soar:*

> It is fundamental that for a contract to be enforceable, it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties. Applying this principle to the present case, we are convinced that ... the alleged oral contract was too indefinite to be enforced even it if fulfilled the other conditions of a valid contract.... [A]ny agreement which leaves unanswered such critical questions [as this one does] cannot by any reasonable stretch of the imagination be said to represent a real "meeting of the minds."

550 F.2d at 1290 (citations omitted).

Likewise, in *Laseter v. Pet Dairy Products Co.*, 246 F.2d 747, 748 (4th Cir.1957), the court declined to enforce an employer's assurance to an injured employee that "the company was going to take care of him." The plant manager for the defendant company told the worker that he would be given "light work" once he was physically able to do it, but no specific job was mentioned and there was no discussion of pay, hours, or duration of employment. The court concluded that the claimed contract of employment was "too indefinite to be enforced" and ordered dismissal of the action. *Id.* at 750. *See also Cotton v. Roberts' Estate*, 47 Tenn.App. 277, 337 S.W.2d 776 (1960) (oral statement by decedent that she would see that plaintiff "was taken care of" in her will held too ambiguous, vague, and indefinite to be enforceable); *Scott v. Grinnell*, 102 N.H. 490, 161 A.2d

179 (1960) (promise to leave plaintiff sufficient money to support her in style to which plaintiff was accustomed held too vague); *Saunder v. Baryshnikov*, 110 A.D.2d 511, 487 N.Y.S.2d 51 (1 Dept.1985) (private secretary's claim against her employer on alleged oral promise to take care of the secretary and her financial needs for life too vague to be enforced).

Hence, even if the parties in this case thought they had an understanding, their agreement would not be legally enforceable unless the court could discern what the agreement was. As provided in the *Restatement 2d of Contracts* § 33(1), "[e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." Moreover, those terms cannot be deemed "reasonably certain" unless they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* at § 33(2).

In this case, the record shows that the parties intended that the plaintiffs would be "taken care of" through payments funded by a union check-off. But assuming the existence of a valid consideration for this benefit, there is no way for us to determine the essential details of that commitment. How long, for example, were the payments to continue? Were they to increase as the wages of the regular workers increased? When and under what circumstances might they be terminated?

Certainly, the law does not favor perpetual contracts. *In re Miller*, 90 N.J. 210, 218, 447 A.2d 549, 553–54 (1982) (perpetual contract performance "to be avoided unless there is a clear manifestation that the parties intended it", citing 1 *Williston* § 38 (3d ed 1957); 3 *Corbin on Contracts* § 553 (1960)). At the same time, the modern view is that "indefiniteness in non-essential terms ought not to defeat the reasonable expectations of the parties." 1 *Corbin on Contracts* § 95 Supp. p. 223 (1963, Supp. 1990). Thus, faced with a contractual deficiency as to length of performance, some courts would impose a reasonable period of duration. *See, e.g., Stark v. Shaw*, 155 Cal.App.2d 171, 317 P.2d 182 (1957). Others would nevertheless hold to the traditional view that in the absence of an explicit agreement as to date of termination, the contract is terminable at will by either party. *See, e.g., First Flight Assoc., Inc., v. Professional Golf Co., Inc.*, 527 F.2d 931 (6th Cir.1975). Still others would say that it is terminable upon reasonable notice. *See, e.g., McGinnis Piano & Organ Co. v. Yamaha Int'l Corp.*, 480 F.2d 474 (8th Cir.1973).

But even if we were to find the existence of a valid contract and impose our notion of reasonable duration on the union's obligation to perform, rather than strike down the agreement as too indefinite to be enforced, we could not uphold the decision of the Court of Appeals. Obligating the union membership to make payments until the last plaintiff reaches age 62, a period that might stretch over decades, is clearly not reasonable under the circumstances.

## V. CONCLUSION

We hold that neither the assurances made by union officers to the plaintiffs at the secret meeting on March 16, nor the official action taken by the membership at the union meeting on March 30, gave rise to an enforceable contract between the plaintiffs and the defendant union. We therefore reverse the judgment entered by the Court of Appeals and by the trial court, enter judgment in favor of the defendant, and dismiss the action with prejudice. Costs will be taxed equally.

DROWOTA, O'BRIEN and ANDERSON, JJ., concur.

REID, C.J., dissents in separate opinion.

REID, Chief Justice, dissenting.

I would affirm the judgments of the Chancellor and the Court of Appeals that the plaintiffs and the local union entered into an enforceable contract; in addition, I

would affirm the judgment of the Chancellor as to the duration of the union's obligation under the contract.

The majority reverses the concurrent findings of the Chancery Court and the Court of Appeals that there is an enforceable contract upon a determination that the facts show lack of mutual assent and indefiniteness of the agreement. The evidence upon which the Court reverses the lower courts is the debate at the union meeting when the disputed agreement, which was negotiated by the union officers and the plaintiffs at the Fishery Park meeting, was presented to the union for ratification.

It appears that the majority misapprehends the plaintiffs' insistence and the lower courts' findings with regard to this determinative factual issue. The majority states:

The chancellor's order comes closer [than does the decision of the Court of Appeals] to full recognition of the context of the commitment made by the union on March 30. What it fails to take into account is the plaintiffs' insistence that the union is bound by assurances purportedly made by the negotiating team at the earlier meeting.

Plaintiffs insist and the courts found that the union is "bound by the assurances" made by the negotiating team because those assurances were agreed to by the plaintiffs and ratified by the union.

The union membership ratified by vote the agreement between the union and the plaintiffs, acknowledged that an increase in dues would be necessary to fund the agreement, and subsequently raised dues approximately fifty dollars per member for that purpose. Statements made by the members during debate, found by the majority to be evidence of uncertainty, are immaterial. That some of the members may not have understood the terms of the agreement, or considered the agreement ill-advised, or voted against ratification of the agreement is immaterial. The material facts are that the union by majority vote (274 to 29) ratified the agreement and that

after the collective bargaining agreement with the company was approved it increased dues to provide the funds necessary to fulfill the union's contractual obligation to the plaintiffs.

The Court of Appeals properly disposed of the evidence relied upon by the majority with the following statement:

*Notwithstanding what they may have thought,* it is clear from the transcript of the proceeding of the Local meeting that the motion was to pay the employees " 'til they're back in the plant." (Emphasis added.)

Perhaps the most compelling evidence of mutual assent regarding the terms of the agreement is the union's payments of wages and insurance costs to the plaintiffs for approximately two years. As stated in *Restatement 2d of Contracts* § 19, "[t]he manifestation of assent may be wholly or partly by written or spoken words or by other acts or by failure to act." In this case, there was action (payments), as well as spoken assent (the vote of the members).

The facts leave no doubt as to the construction placed on the agreement by the parties. The plaintiffs allowed the proposed collective bargaining agreement between the employer and the union to be ratified by the union. The union, with funds provided by an increase in dues voted by the members, paid to each plaintiff an amount equal to the wages he would have received under the collective bargaining agreement and the amount of his insurance premiums. That this obligation became burdensome does not render the agreement uncertain or unenforceable. The record supports the trial court's finding that "(t)he agreement of the parties was that the union would pay the plaintiffs their wages and insurance until such time as the plaintiffs' arbitration or other legal remedies was exhausted."

The agreement, furthermore, is not rendered unenforceable because its terms do

not include a terminal date. The applicable law is stated in 17 C.J.S. *Contracts* § 36(2) (1963) as follows:

A contract is not fatally indefinite merely because it does not specify a time presently definite for its termination.

It is clear the parties contemplated, as found by the Chancellor, that the agreement would continue until the issue of the plaintiffs' re-employment was resolved by arbitration, which, according to the record, was proceeding at the time of trial. The trial court properly found that, based on the circumstances which prompted the making of the agreement, the union's obligation would not extend beyond the term of the collective bargaining contract.

Consequently, I would hold that the record demonstrates that the parties did mutually assent and the terms of the agreement are not unenforceably indefinite.