John G. Mac'KIE, III, and Tennessee Southern Title United Development Company, Plaintiffs,

v.

WAL–MART STORES, INC., Defendant.

No. 3:92–cv–0836.

United States District Court, E.D. Tennessee, at Knoxville.

April 16, 1996.

David N. Garst and R. Loy Waldrop, Jr., Lewis, King, Krieg, Waldrop & Catron, Knoxville, TN, for Plaintiffs.

Charles G. Taylor, III, McDonald, Levy & Taylor, Knoxville, TN, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

The court tried this civil action without a jury for a period of three to four days. Before the trial, the parties stated their theories and the issues for decision in a well-drawn agreed pretrial order [doc. 43]. In their pretrial order, the parties stated a few stipulations of fact: that the plaintiffs and the defendant are the owners of their respective properties; that the plaintiff Mr. Mac'Kie and the defendant entered into a June 25, 1992, agreement; that Laura Bevilacqua and Richard Lietz were at all material times employees and agents of the defendant Wal–Mart Stores, Inc. (Wal–Mart); that Drew Anderson was at all material times an employee and agent of the plaintiffs; that Hudson Construction Co., Inc. (Hudson), was at all material times Wal–Mart's general contractor with respect to the construction project which is a subject of this litigation; and that B & R Builders, Inc. (B & R), was at all material times a subcontractor of Hudson on this project.

While the parties made few stipulations of fact, they were able to agree concerning the authenticity and admissibility of a large collection of documents submitted as evidence at the trial of this civil action. The parties' joint stipulation of prospective trial exhibits [doc. 80] consists of 20 pages listing close to 300 exhibits.

The court finds as follows. The plaintiff Mr. Mac'Kie arranged for an exchange of real property with the defendant Wal–Mart. The land which was the subject of this exchange is situated in Athens, McMinn County, Tennessee. By the exchange, Wal–Mart acquired a tract on which to build a discount retail store, and the plaintiffs had an adjacent tract. Mr. Mac'Kie was interested in improving the commercial value of the adjacent tract by having reciprocal right-of-way easements for ingress and egress between the Wal–Mart tract and the plaintiffs' tract, and by having the plaintiffs' tract filled with dirt to bring it up to a level at or near the elevation of the Wal–Mart tract upon completion of the construction of the retail store and parking lot.

Improving the plaintiffs' tract in this manner required much dirt, because at or near the site of the boundary between the Wal–Mart tract and the plaintiffs', the land sloped down to a gully. Wal–Mart's construction plans called for the erection of a retaining wall at or near this boundary, with the result of leaving the plaintiffs' tract at a significantly lower elevation than Wal–Mart's. Mr. Mac'Kie proposed that a culvert be placed in the gully, and that the excess dirt on the Wal–Mart tract be moved over the culvert onto the plaintiffs' tract. As can be seen in Mr. Mac'Kie's October 2, 1991, letter [plaintiffs' ex. 14] to Tom L. McCaleb, P.E., of Spear & McCaleb Co., Inc., a firm of consulting engineers advising Wal–Mart with respect to its Athens project (Spear & McCaleb), Mr. Mac'Kie couched this proposal in terms of mutual benefit, stating that if Wal–Mart were to install reinforced concrete box (RCB) culvert measuring eight feet by eight feet along the southwest portion of the Wal–Mart tract, at the location of the proposed reciprocal easements, Wal–Mart could pan its approximately 340,000 cubic yards of excess dirt onto the plaintiffs' tract, which would be significantly less expensive than hauling it off-site. It is clear from Wal–Mart's general contractor's correspondence with the defendant [see plaintiffs' ex. 101] that moving excess dirt onto the plaintiffs' tract, as opposed

to hauling it elsewhere, would have reduced the defendant's total construction costs by hundreds of thousands of dollars.

Negotiations led to a June 25, 1992, agreement between Mr. Mac'Kie and Wal–Mart [plaintiffs' ex. 47], in which Wal–Mart agreed to be responsible for relocation of a sanitary sewer force main and a water line as required by the Athens Utility Board; the parties agreed to perpetual reciprocal easements; Wal–Mart agreed to be responsible for relocation of an AT & T cable on the plaintiffs' tract; and Wal–Mart agreed to be responsible for raising an electric energy line to accommodate earth-moving equipment. In the major provisions of this agreement, "Mac'Kie agree[d] to accept all of the excess waste material (to exclude brush, debris, trash, construction debris, etc.) for fill on his property from the Wal–Mart development," and it was agreed that "Wal–Mart's general contractor may use Mac'Kie's site … for dumping excess material, but has no obligation to do so, and will incur no penalty if he chooses not to." The parties agreed that if Wal–Mart's contractor chose to place dirt on the plaintiffs' tract, this contractor and Mr. Mac'Kie's engineer or contractor would coordinate their work.

Such coordination, the evidence shows, was very necessary to the performance of any agreement between the parties. Wal–Mart needed to remove the excess dirt from its site at a rate which would be in keeping with its construction schedule. To prevent delay, the plaintiffs needed to have their site cleared and grubbed, and to be ready to compact fill as it was delivered.

Pursuant to this agreement, Wal–Mart paid $100,000.00 to Mr. Mac'Kie for the privilege of placing excess dirt on the plaintiffs' land, and advanced $25,000.00 to pay for clearing the plaintiffs' tract to accept the dirt. The court notes that although Mr. Mac'Kie had asked for it during the parties' negotiations, in the final agreement Wal–Mart accepted no responsibility for compaction of any fill on the plaintiffs' tract.

The June 25, 1992, agreement provides that it "can be changed only by written agreement signed by all parties." The court credits the testimony that Wal–Mart, like many large corporations, has a policy which requires that any agreement to which it is a party be reduced to a final, signed writing. An example of the defendant's strict enforcement of this policy may be seen in a January 13, 1992, letter from Richard G. Lietz, a Wal–Mart real estate manager, to Mr. Mac'Kie [plaintiffs' ex. 40], in which Mr. Lietz, after discussing the relocation of AT & T cable and an electric energy line on the plaintiffs' property, concluded by stating, "This letter does not constitute an acceptance of your proposal in any way."

It is significant to note in relation to this that Mr. Mac'Kie was at all pertinent times a sophisticated real estate developer. He was an attorney with a graduate degree in real estate development law, admitted to the bars of four states. He was a licensed realtor in the State of Tennessee. He held a 50% financial interest, and a 51% voting interest, in the corporate plaintiff.

The June 1992 agreement was not entirely satisfactory to Mr. Mac'Kie, and so he continued to negotiate with Wal–Mart with an eye to the improvement of the plaintiffs' tract. In particular, Mr. Mac'Kie was concerned that Wal–Mart's construction plans showed a retaining wall at or near Wal–Mart's boundary with the plaintiffs' tract. A drawing which was exhibit C to the June 1992 agreement showed only 200 feet of culvert installed. This was the length of culvert which the defendant understood at the time might be required by the City of Athens. (At the time, the excavation subcontractor was using a temporary culvert over which to move dirt onto the plaintiffs' tract.) Mr. Mac'Kie understood from a prior study of the plaintiffs' tract performed by Allen & Hoshall, a firm of engineers, architects, and consultants engaged by him, that 600 feet or more of RCB culvert might be needed on the plaintiffs' tract to accommodate approximately 300,000 cubic yards of fill, compacted to prevent soil erosion and run-off into a stream of water.

Discussions concerning these issues led to Mr. Mac'Kie's attendance at a July 27, 1992, pre-construction meeting concerning the Wal–Mart project, held in Athens. Attending the meeting were representatives of Wal–

Mart, including Mr. Lietz, the real estate manager, and Ms. Laura Bevilacqua, a construction manager. Mr. McCaleb of the firm of consulting engineers advising Wal–Mart attended, as did the project superintendent of Wal–Mart's general contractor, Hudson, representatives of the City of Athens, and representatives of various subcontractors.

The general contractor's minutes of this meeting [plaintiffs' exs. 49 and 167] state that the retaining wall, site excavation, drainage and other site problems were discussed by representatives of the defendant, the general contractor, subcontractors, the city, and "adjacent land owner." The minutes state as follows:

Mr. Mac'Kie, the adjacent property owner, discussed with the Wal–Mart representative the possibility of deleting a large portion of the retaining wall and what impact this would have on the project. This brought about a discussion on what type of drainage system could Wal–Mart install and what effect it would have on the City of Athens['] present system for drainage and the pump station. The City of Athens Water Utilities representative made it very clear that the City of Athens will not bear the expense of any relocations or modifications to their present system. Nor would they be willing to be involved in the actual costing, bidding or hiring of subcontractor to do this work. The Athens Utility will only involve its company to the extent of issuing guidelines and specifications for any work done.

The pending decision to this problem has raised another concern of delays to the project. With the relocation and/or deletion of any portion of the retaining wall, at this point has caused great concerns as to the continuing work to relocate the dirt from Wal–Mart's property to the adjacent landowners['] property.

After much discussion it was decided that Laura [Bevilacqua] will issue a letter for a change order based on the recommendations from the Wal–Mart staff of engineers. At this point Hudson Construction's subcontractor for site excavation will continue to work on the front sections and await further instruction from Hudson Construction. Wal–Mart will issue a letter to Hudson Construction and Hudson will price the change order to Wal–Mart. The change will consist of deleting a large portion of retaining wall #3 and adding approximately 500 [linear feet of] 8′ × 8′ boxculvert. Details to be designed by Spear and McCaleb.

Mr. Mac'Kie testified that at the conclusion of this meeting, he met Mr. Lietz of Wal–Mart in a hallway, and stated to Mr. Lietz his understanding that the plaintiffs and the defendant had agreed that Wal–Mart would move all of its excess dirt onto the plaintiffs' tract, and that Wal–Mart would install a length of culvert sufficient to accommodate the excess dirt. Mr. Mac'Kie testified that Mr. Lietz nodded in response to this, and that later, in the presence of others, Mr. Mac'Kie and Mr. Lietz shook hands on the deal. Mr. Mac'Kie was not concerned about the fact that there was no specific agreement concerning the length of the culvert to be installed, because, he testified, this could be calculated by an engineer knowing the volume of space to be filled, the amount of soil to be placed on the plaintiffs' tract, and the maximum permissible elevation of the plaintiffs' tract.

Believing that he had what he wanted, Mr. Mac'Kie engaged his firm of consulting engineers, Allen & Hoshall, in July 1992 to prepare a rough grading plan of the plaintiffs' tract to show the accommodation of approximately 300,000 cubic yards of fill, to perform hydrologic and hydraulic calculations for the purpose of recommending a type of culvert or drain pipe for the drainage way on the plaintiffs' tract, to prepare an erosion control plan, and to coordinate the grading plan and the erosion control plan with the City of Athens and the Tennessee Department of Transportation. [See plaintiffs' ex. 12.] Mr. Mac'Kie and Allen & Hoshall also agreed to revise their agreement for engineering services to provide for regrading the plaintiffs' tract "to reflect the elimination of Walmart's retaining wall and the subsequent shifting of the fill area," and to prepare calculations concerning stormwater detention. [Plaintiffs' ex. 51.] However, Mr. Mac'Kie did not sign this latter agreement until August 27,

1992, after Wal–Mart had ceased to allow excess dirt to be placed on the plaintiffs' tract.

Later, in August 1992, Allen & Hoshall was concerned that a Spear & McCaleb proposal prepared for Wal–Mart, showing a total of approximately 750 feet of culvert, 200 feet as shown on the exhibit to the June 1992 agreement plus approximately 550 feet more, was inadequate for the disposition of excess fill on the plaintiffs' tract with a resulting elevation acceptable to the plaintiffs. Mr. Mac'Kie believed that Wal–Mart's engineers must have made an error. Mr. Mac'Kie testified that he telephoned Mr. Lietz of Wal–Mart to impress on the latter again the savings which might be realized by Wal–Mart by installing culvert instead of using a retaining wall, and that Mr. Lietz responded that he did not wish to make a career of the Athens project. Mr. Lietz told Mr. Mac'Kie that the project was a "go," according to Mr. Mac'Kie, and Mr. Mac'Kie testified that he understood this to constitute Wal–Mart's approval of the Allen & Hoshall plan providing for 1,100 feet of culvert.

On August 21, 1992, Mr. Mac'Kie wrote to Mr. Lietz, stating his belief that Wal–Mart's engineers had erred, and his understanding that Wal–Mart was committed to the installation of 1,100 feet of culvert. [Plaintiffs' ex. 60.] On August 24, Mr. Lietz responded that "we believe that we will not be able to accommodate your requirements," and that "[a]t this point we are pursuing other avenues to dispose of the material." [Plaintiffs' ex. 64.]

Before this, the work of moving the excess fill onto the plaintiffs' tract did not go smoothly. The plaintiffs' contractor was late in getting to the site, delaying the project. Reports and correspondence to Wal–Mart from the general contractor and the excavation subcontractor [see plaintiffs' exs. 108 through 113] indicate that a lack of readiness on the plaintiffs' side of the boundary line led to Wal–Mart's excavation subcontractor's work being completely stopped. On July 31, 1992, by which time approximately 30,000 cubic yards of fill had been moved onto the plaintiffs' tract, the plaintiffs' contractor, Mr. Anderson, instructed the defendant's excavation subcontractor not to move any more fill onto the plaintiffs' tract, because the elevation on the plaintiffs' tract had reached 900 feet. The excavation subcontractor advised Hudson Construction Company that "[d]ue to the need for an 8 × 8 box culvert in the existing drain and the need for the removal of power lines it is our opinion that further placing of dirt on the Mac[']Kie property would be detrimental to the entire project." In early August 1992, Ms. Bevilacqua sought from Mr. McCaleb, Wal–Mart's consulting engineer, a design of a force main or culvert which might permit this excavation work to proceed.

By August 21, 1992, Spear & McCaleb had provided drawings, and Hudson submitted to Wal–Mart a proposal for a change order to provide for 550 feet of box culvert having dimensions of eight feet by eight feet, with extra compacted fill, the relocation of a force main, the deletion of retaining walls, and engineering and supervision. [Plaintiffs' ex. 118.] Earlier, on August 13, Spear & McCaleb had issued a change order pertaining to Wal–Mart's Athens project and providing for partial elimination of the west retaining wall, installation of culvert along the west property line, and changes to the grading along this property line; it was stated on the transmittal letter accompanying the change order, "This Change Order is for pricing only, not an authorization for construction." [Plaintiffs' ex. 95.] On August 21, the general contractor also confirmed its precontract bid "to truck the excess materials offsite," for an amount higher than the amount of the proposal to install the 550 feet of culvert. [Plaintiffs' ex. 119.]

On August 21, 1992, Ms. Bevilacqua of Wal–Mart instructed Hudson to proceed and to "off-haul material," [plaintiffs' ex. 120], an instruction which the general contractor passed on to the subcontractor. [Plaintiffs' ex. 250.] On Monday, August 24, the general contractor instructed the appropriate subcontractor "to proceed with the original plan of making retaining walls." [Plaintiffs' ex. 121.] On August 21, Mr. Mac'Kie learned of the decision that the excess fill on the Wal–Mart tract was to be hauled away from the site, and so sent Mr. Anderson, the plaintiffs' contractor, to make an agreement with the

excavation subcontractor to pan the fill onto the plaintiffs' site, in exchange for a price per cubic yard to be paid to the plaintiffs. James Paul Garrett of the excavation subcontractor testified by way of deposition that the plaintiffs offered a written contract to this effect, but that it was never signed, because the subcontractor believed that it should consult with the general contractor before entering into such a contract. The subcontractor abided by the project owner's decision requiring that the excess fill be hauled away from the construction site because, according to Mr. Garrett, Wal–Mart had a right to determine the disposition of the excess fill.

Before Wal–Mart finally prohibited the moving of any dirt onto the plaintiffs' tract, the general contractor communicated to Mr. Mac'Kie that the excavation subcontractor would not be allowed to pan fill onto the plaintiffs' tract without a hold-harmless agreement. Mr. Mac'Kie delivered to Hudson on August 24, 1992, a handwritten letter [plaintiffs' ex. 62] stating,

> Should Hudson Construction Company undertake to dispose of the excess fill material from Wal–Mart's site onto my adjacent property in Athens, Tennessee, I will provide to HCC a hold harmless agreement by which I will agree to hold HCC harmless from any and all claims which may arise from said action, except willful or negligent acts of HCC. In the event that HCC chooses to utilize my property to dispose of the excess fill, HCC shall direct its subcontractor to coordinate the deposition of the material with my engineer and/or contractor.

At trial, Stephen Howard Hudson, a project manager and estimator employed by Hudson (but not related to any owner of the company), denied that he had promised that upon delivery of a hold-harmless agreement, the general contractor would permit the resumption of the panning of excess fill onto the plaintiffs' tract.

For a very brief period of time, the excavation subcontractor panned fill onto the plaintiffs' tract. On August 25, 1992, Ms. Bevilacqua of Wal–Mart forbade the delivery of fill from the Wal–Mart construction site to the plaintiffs' tract. She testified that she made

this decision because of the delay caused by the plaintiffs' contractor when he prevented fill from being deposited above a certain elevation, because she was concerned that the plaintiffs did not have a grading permit or a soil erosion control plan, and because she did not feel comfortable continuing to deal with the plaintiffs in light of the discrepancies between the plaintiffs' understanding and Wal–Mart's understanding of the parties' agreement. The excavation subcontractor began to truck the excess fill to a site about one and one-half miles from the Wal–Mart construction site, and on August 28, 1992, Hudson Construction Company issued a change order [plaintiffs' ex. 230] requiring the subcontractor to "remove by truck from the Wal–Mart property ... all excess soil and arrange for disposal of said excess soil at [the subcontractor's] sole cost and expense," in exchange for a fixed price.

Taking up first the issue of what Mr. Mac'Kie refers to as the parties' July agreement, the court concludes that no such agreement existed. Wal–Mart agreed at the July pre-construction meeting to consider Mr. Mac'Kie's proposal, and so asked Spear & McCaleb to prepare a plan under which the retaining wall would be eliminated and a culvert installed. The purpose of ordering this engineering work was to determine more definitely whether the proposed alternative would be truly cost-efficient from Wal–Mart's point of view. That this was the purpose is shown by the fact that after Spear & McCaleb completed its work in this regard, a change order was issued to Hudson, Wal–Mart's general contractor, for pricing only.

■ The court does not find credible the testimony that Wal–Mart accepted Mr. Mac'Kie's proposal before there was any engineering study on which to base an estimate of Wal–Mart's costs attributable to such a project change. The court credits the testimony of Mr. Lietz that he did not make any such agreement at the July 1992 meeting or in the hallway after the pre-construction meeting, and that he did not, during a subsequent telephone conversation with Mr. Mac'Kie, assent to a change in the project in accordance with Allen & Hoshall's proposal calling for 1,100 feet of culvert. The court

concludes that Mr. Lietz had no authority to enter into such an oral agreement on behalf of Wal–Mart, and that he did not misrepresent his authority, or negligently allow the plaintiffs to believe that he had such authority.

Resolving conflicts in the evidence concerning the July meeting, the court accepts as more likely true the testimony of those who did not believe that a bargain was struck between Mr. Lietz and Mr. Mac'Kie. Kent Adderholdt of Allen & Hoshall, for example, called as a witness by the defendant, testified that no agreement was made during the pre-construction meeting, and that he understood the discussion in the hallway to be nothing more than a recap of what the parties had discussed. James Paul Garrett of the excavation subcontractor testified by way of deposition that no definite contract was made at the July meeting.

Richard Yarbrough, an engineer formerly employed by Allen & Hoshall, called as a witness by the plaintiffs, testified that he believed that Mr. Lietz and Mr. Mac'Kie made a binding agreement during their hallway discussion, but this witness understood that a change order would have to be issued for pricing by Hudson Construction Company, and that Wal–Mart would have the final say concerning any changes to the contract for the construction of the Athens store. Mr. Yarbrough conceded that after the hallway discussion, significant issues, such as whether to place an existing force main inside the proposed culvert, remained open.

The view that Mr. Lietz and Mr. Mac'Kie did not make a binding agreement in July 1992 is consistent with the evidence that Wal–Mart required that agreements be reduced to writing, and is consistent also with the course of events after the meeting, especially the issuance of a change order for pricing only. It is also consistent with the fact that after the July 1992 meeting, too many details of Mr. Mac'Kie's proposal remained unclear to permit the court to find that a definite agreement existed. While the plaintiffs say that the alleged contract was definite because only engineering calculations were needed to determine the length of the necessary culvert, the court cannot ignore the fact that Spear & McCaleb and Allen & Hoshall recommended different lengths of culvert.

Furthermore, the benefit which Wal–Mart might have derived from incorporating the Allen & Hoshall proposal into its contract for the Athens project is not so readily apparent as to convince the court that the defendant assented to this in July 1992 without any cost figures. The financial benefit to the defendant would have accrued more from the ability to dispose of its excess dirt readily than from replacing its retaining wall with 1,100 feet of culvert. While Mr. Mac'Kie stated in an affidavit [plaintiffs' ex. 78] that at the July meeting, Mr. Lietz agreed on behalf of Wal–Mart "that Wal–Mart would delete the retaining wall contemplated along the southern boundary of Wal–Mart's property and would install culvert on my property ... sufficient to accommodate the disposal of Wal–Mart's excess fill onto my property at a 900–910 contour," and that in consideration of this agreement Mr. Mac'Kie "agreed to allow Wal–Mart to dispose of its approximately 300,000 cubic yards of excess fill onto [his] property," the defendant already had the right to do this, under the June 1992 agreement. Installing a culvert beyond the defendant's property line would not have benefitted the defendant at all, but would have assisted the development and enhanced the value of land owned by the plaintiffs. The court concludes that Mr. Mac'Kie, unable to resist negotiating for a very lopsided bargain, overreached, and lost the benefit which he had already won in the June 1992 agreement, by delaying the defendant's construction schedule. The delays deprived the option granted in the June agreement to place excess dirt on the plaintiffs' tract of its financial value to the defendant, and so the defendant properly, and in accordance with the June agreement, chose different means by which to remove the excess dirt from its construction site.

The contention that there was a July 1992 agreement fails for the absence of a meeting of the minds and for the lack of definiteness in its terms. *Higgins v. Oil, Chemical and Atomic Workers International Union, Local # 3–677,* 811 S.W.2d 875, 879, 881 (Tenn.

1991)[1]. The parties were free in the June 1992 agreement to prohibit modification of the agreement except by a signed writing, Tennessee Code Annotated § 47–50–112(c), and, the court concludes, the July agreement, had the parties entered into it, would have been a substantial modification of the June agreement within the scope of this provision. In any event, the court is bound to enforce the June 1992 agreement as written, there being no evidence of mutual intent to rescind it. T.C.A. § 47–50–112(a); *Tidwell v. Morgan Building Systems, Inc.,* 840 S.W.2d 373 (Tenn.Ct.App.), *perm. app. denied, id.* (Tenn. 1992).

Furthermore, no consideration has been shown to support the existence of the claimed July agreement. The defendant already had a contractual right to deposit its excess dirt on the plaintiffs' tract. "[A] promise to perform what one is already legally obligated to do is not a valuable consideration...." *Pearson v. Garrett Financial Services, Inc.,* 849 S.W.2d 776, 778 (Tenn.Ct. App.1992), *perm. app. denied, id.* (Tenn. 1993).

The defendant did not breach the June agreement, which expressly allowed the defendant to choose not to place its excess dirt on the plaintiffs' tract. The fact that a 220–feet length of culvert is shown on exhibit C to the June agreement, which was made an exhibit to the agreement for reference, did not create an obligation on the part of the defendant to install this length of conduit. There is no mention in the written contract itself of such an obligation.

Wal–Mart had a right, under the contract relating to the construction of its Athens store and under the June 1992 agreement, to require that excess dirt from its construction site be hauled to another location. Under the facts of this case, Wal–Mart's concerns that continuing to allow excess dirt to be placed on the plaintiffs' tract would lead to further delays in the construction of its store, and might lead to litigation with the plaintiffs, were legitimate. With the change order to the excavation subcontract, the defendant paid a contract amount established on the basis of hauling the excess dirt away from the site. The excavation subcontractor understood any agreement made directly with the plaintiffs to be contingent on the general contractor's and the project owner's approval, and did not execute the contract proposed by the plaintiffs when such approval was withheld. Under these circumstances, the court finding neither an enforceable contract between the excavation subcontractor and the plaintiffs nor malice on the part of Wal–Mart, the defendant cannot be held to have procured a breach of an agreement under T.C.A. § 47–50–109 or common law. *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.,* 876 S.W.2d 818, 822 (Tenn.1994).

Nor does the court find that the defendant tortiously interfered with a prospective contractual relationship, even assuming that Tennessee law recognizes such a tort. *See id.* at 823–24. The defendant paid to have its excess dirt hauled away from its construction site, and had an urgent interest in preventing any delays in this aspect of its construction project.

It follows from these conclusions that the plaintiffs are not entitled to recover on any of the theories advanced by them in this civil action. The court will therefore enter a judgment in favor of the defendant and against the plaintiffs, in accordance with these findings of fact and conclusions of law.

### ORDER

For the reasons stated in the court's findings of fact and conclusions of law filed with this order, the court finds in favor of the defendant and against the plaintiffs in this civil action, and rules that the plaintiffs should recover nothing against the defendant.

The clerk is directed to enter judgment in accordance with this decision, pursuant to Fed.R.Civ.P. 58.

---

**1.** There is no dispute that Tennessee law pro- vides the rules of decision in this diversity action.