IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 14, 2005 Session

RICHARD PETERSEN, INDIVIDUALLY AND AS NATURAL PARENT OF THE
MINOR CHILD, RACHEL PETERSEN, DECEASED, AND
KAREN FOSMIRE, INDIVIDUALLY AND AS NATURAL PARENT AND LEGAL
GUARDIAN OF RACHEL PETERSEN, DECEASED
v.
GENESIS LEARNING CENTERS AND
THERAPEUTIC INTERVENTIONS, INC.

An Appeal from the Circuit Court for Sumner County
No. 22020-C    C. L. Rogers, Judge

No. M2004-01503-COA-R3-CV - Filed December 13, 2005

This is an action to enforce a settlement agreement. In the underlying lawsuit, the plaintiffs filed a complaint against the defendant foster care provider for the wrongful death of their daughter. The defendant had an insurance policy with "withering" limits, in which the policy limits are reduced by the amount expended in defending the lawsuit. The week before trial, counsel for the defendant sent a letter to counsel for the plaintiffs offering to settle the case for the remaining policy limits which, at the time, were $575,000. The plaintiffs asked the defendant to allow the offer to remain open for forty-eight (48) hours. The defendant agreed, but the defendant's trial preparation continued. Two days later, the plaintiffs accepted the defendant's offer. By that time, the policy limits had eroded to $450,000. The plaintiffs filed a motion to enforce the settlement agreement in the amount of $575,000. The trial court granted the motion. The defendant now appeals. We reverse, concluding that the parties' correspondence does not reflect a meeting of the minds on the settlement amount.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

John S. Hicks and Christy Tosh Crider, Nashville, Tennessee, for the appellant, Therapeutic Interventions, Inc.

Clinton L. Kelly, Hendersonville, Tennessee, and Thomas Boyers, V, Gallatin, Tennessee, for the appellees, Richard Petersen and Karen Fosmire.

**OPINION**

This case arises out of tragic circumstances. Defendant/Appellant Therapeutic Interventions, Inc. ("TII"), is a foster care provider for children in state custody. By contract with Genesis Learning Centers, TII provided foster care services to Eric, who is the son of Plaintiffs/Appellees Richard Petersen ("Petersen") and Karen Fosmire ("Fosmire") (collectively, "Plaintiffs"). Eric's younger sister Rachel lived with their mother, Fosmire. While Eric was on a home visit with Fosmire, he was left at home with Rachel. During this time, Eric murdered Rachel. The Plaintiffs thereafter filed a wrongful death lawsuit against TII, Genesis Learning Centers, and the State of Tennessee.

TII was insured under an insurance policy with coverage limits in the amount of $1,000,000. The TII policy is described as a "withering" policy, because all of the expenses associated with the defense of the lawsuit are subtracted from the coverage amount. In 2001, counsel for TII informed Plaintiffs' counsel[1] that TII's insurance policy had such "withering" limits, and that all legal fees and expenses incurred in defending the case would reduce the amount remaining for settlement. At that time, the trial was scheduled to commence on May 17, 2004.

On Monday, May 10, 2004, counsel for TII, Christy Tosh Crider ("Crider"), received authorization from TII and its insurance company to make a written offer to the plaintiffs to settle the case for the remaining policy limits. On that day, Crider faxed a letter to Plaintiffs' counsel containing the following language:

> I have been authorized to offer you the remaining limits under Therapeutic Intervention's [sic] insurance policy in exchange for a full and final release of all claims of Richard Petersen and Karen Fosmire against Therapeutic Interventions as well as an agreement to indemnify and hold harmless Therapeutic Interventions from claims by Genesis or Genesis' insurance company against Therapeutic Interventions. As you know, the insurance policy started at $1,000,000. The extensive fees and expenses in this case have eroded the limits. There is approximately $575,000 remaining on the insurance policy at this point. As you are aware, if Therapeutic Interventions tries this lawsuit, there will be significantly less money available to pay Mrs. Fosmire and Mr. Petersen. As you also know from the deficit sheets, they really do not have anything to offer beyond their limits and any excess judgment is not collectable.

(Hereinafter "May 10 offer"). Although Crider's letter estimated that the policy limits remaining at that time were "approximately $575,000," Crider had underestimated the amount of unbilled fees and expenses by about $50,000. In addition, as part of TII's trial preparation, a very expensive mock trial was scheduled for the night Crider faxed the letter.

---

[1] References to either Petersen's attorney or Fosmire's attorney, or both, will be to "Plaintiffs' counsel."

On the day that the offer was sent, after the offer letter was faxed, Crider called Plaintiffs' counsel on the telephone and informed them that the mock trial was scheduled to take place that evening, and that "if there was anyway [sic] he could accept before the mock trial began, we would be able to stop some of the enormous expenses from further eroding the limits." The Plaintiffs did not accept the settlement offer at that point, and TII proceeded with the mock trial that evening. The cost of the mock trial was approximately $45,000, not including attorney's fees, videographers, and other providers.

On May 11, 2004, Plaintiffs' counsel called Crider on the telephone and requested that the settlement offer be kept open for forty-eight (48) hours. Crider claimed that in that conversation, she advised counsel for Fosmire that trial preparation would continue, which would further reduce the remaining money available for settlement. After that telephone conversation, Plaintiffs' counsel faxed Crider a letter confirming the request to keep the offer open:

> Tom and I ask that you keep your offer open for 48 hours, to give us an opportunity to confer with our clients and — in accordance with our telephone conversation — draft some type of indemnity language that is acceptable to both.
>
> Please fax to my office your agreement to keep the offer open for 48 hours, as well as your suggestions as to indemnity language.

Later that same day, Crider sent a letter in response, which stated:

> I am in receipt of your request to keep our offer open for 48 hours to give you and Tom an opportunity to confer with your clients. I have spoken with Dr. Call, Michael Hullett and our insurance adjuster. Although they are reluctant, based upon the results of the mock trial last night, they are willing to keep the offer open for 48 hours from the time that we made it. This means that the offer will expire at 5:00 p.m. on Wednesday, May 12.

The letter also set out possible indemnity language to include in the settlement agreement, with the proviso that the indemnity language had not yet been presented to her clients. Later that same day, Crider faxed another letter to Plaintiffs' counsel stating that TII would keep its offer open until Thursday, May 13, at 3:00 p.m.

On the afternoon of Wednesday, May 12, 2004, Plaintiffs' counsel called Crider on the telephone and informed her that they would accept TII's offer. Crider would later say that she understood this to mean that Plaintiffs accepted the offer of "remaining limits." In response, Crider told Plaintiffs' counsel that she would "stop the clock," so that the remaining policy limits could be preserved.

Later that day, Plaintiffs' counsel sent Crider a letter accepting "your offer of $575,000.00." Crider immediately faxed a letter to Plaintiffs' counsel setting out indemnification and assignment

language to which TII would agree, and also informing Plaintiffs' counsel that the estimated remaining limits on the insurance policy were much less than $575,000. The letter stated:

> . . . I have been very clear in all correspondence that we will pay whatever the remaining limits are at the time we finalize the agreement. I have expert bills outstanding, the mock trial bill outstanding (approximately $45,000), and all of my May time. It is a rough estimate, but I believe there is approximately $450,000 to $475,000 remaining. After I get your go ahead, I will draft a release and settlement agreement.

On May 13, 2004, Crider's co-counsel, John Hicks ("Hicks"), sent an e-mail to Plaintiffs' counsel stating, "[I]t is apparent to me that we offered the balance of the limits of the policy covering [TII], whatever that balance amounted to, upon conclusion of the settlement. . . . The two of you, on the other hand, interpreted [Crider's] letter of May 10, 2004 to be an offer of $575,000." Hicks told Plaintiffs' counsel that the remaining limits on the policy were $441,000, but that he nevertheless agreed to pay the Plaintiffs a minimum of $450,000 if the offer were accepted by 4:00 p.m. that day. Plaintiffs did not accept the offer.

Instead, on that same day, May 13, 2004, Plaintiffs filed this motion to enforce the settlement agreement in the amount of $575,000. The facts set out in the complaint are largely undisputed and are documented in the writings quoted above, which were attached as exhibits to the pleadings. Plaintiffs claimed that the plain and ordinary meaning of the language used in the parties' correspondence showed that the parties reached a settlement agreement for $575,000, and that TII was attempting to breach that agreement, stating, "The Court may simply read the letters in this case to conclude that a bargain was struck." TII filed a response in opposition to the Plaintiffs' motion to enforce the settlement in the amount of $575,000, arguing that there was no meeting of the minds regarding a fixed settlement amount. In the alternative, TII argued that the trial court should find that the Plaintiffs accepted TII's offer to settle in an amount equal to the insurance limits remaining at that time.

In support of its response, TII attached an affidavit by Crider, in which she explained the events that transpired between the parties. The affidavit quotes the pertinent language in the parties' written correspondence, and also notes the verbal communications between her and counsel for Plaintiffs. Crider stated that she had advised Plaintiffs' counsel in 2001 that the insurance policy had eroding limits. She noted that the parties had mediated the matter in an attempt to settle, at which time there had been extensive discussions about the fact that, the longer they litigated the case, the further the policy limits would erode.[2] At that time, she said, Plaintiffs' counsel refused the offer of policy limits. Crider emphasized that she was "careful to state in my [May 10] letter that [she] was offering 'remaining limits.' . . . I added the word 'approximately' before the $575,000 remaining." She said that her goal was to give Plaintiffs' counsel an opportunity to accept the settlement offer before the mock trial occurred, so that she could cancel the mock trial and preserve

_____

[2]The affidavit does not provide the date on which the mediation took place.

-4-

the remaining policy limits. Crider admitted that, at the time she sent the letter to Plaintiffs' counsel, she underestimated the unbilled fees and expenses by about $50,000. After receiving the May 10 offer, Crider said, Plaintiffs' counsel called her asking "if [she] could keep the offer of 'remaining limits' open for 48 hours." She responded that she could do so, but told them that she would have to continue to prepare for trial, which would continue to erode the limits. Crider said that she was "puzzled" when Plaintiffs' counsel "accepted" the offer of $575,000, and responded with the letter dated May 12, 2004 stating that TII would pay "whatever the remaining limits are at the time we finalize the agreement," which by that time were between $450,000 and $475,000.

On May 14, 2004, the trial court held a hearing on the Plaintiffs' motion to enforce settlement in the amount of $575,000. At the hearing, the parties agreed that no further filings, evidence, or hearing was being requested, and that the trial court would determine the issue based upon Plaintiffs' motion, TII's response, and any attachments thereto.

On May 17, 2004, the trial court entered an order finding in favor of Plaintiffs and enforcing the settlement agreement in the amount of $575,000. The trial court determined that, through the parties' correspondence, they entered into a contract to settle, and that the letters did not establish any express lack of authority to settle on the part of Crider. Therefore, the trial court ordered specific performance of the settlement agreement in the amount of $575,000. From that order, TII now appeals.

On appeal, TII argues that the trial court erred in enforcing the settlement agreement for $575,000, because Crider did not have authority to settle for more than the remaining limits on the policy, and because the correspondence between the parties shows that there was no meeting of the minds with respect to the terms of the alleged agreement. Whether the parties entered into an enforceable contract is a question of law, subject to *de novo* review on the record, with no deference to the trial court's decision. *See In re Estate of Jones*, 154 S.W.3d 582, 584 (Tenn. Ct. App. 2004); *Reality Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999).

"Consent decrees, compromise and settlement agreements, and agreed orders are favored by the courts and represent the achievement of an amicable result to pending litigation." *In re Estate of Williams*, No. M2000-02434-COA-R3-CV, 2003 WL 1961805, at *11 (Tenn. Ct. App. Apr. 28, 2003). Absent a demonstration of fraud or other compelling circumstances, a court should honor and enforce a settlement agreement as it would any other contract. *Moffett, Larson, & Johnson v. Carman*, No. 01-A-01-9501-CH00007, 1995 WL 322642, at * 3 (Tenn. Ct. App. May 26, 1995). The formation, interpretation, and enforceability of settlement agreements are governed by general contract law. *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996). In order to be enforceable, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms." *Id.* (quoting *Higgins v. Oil, Chem. & Atomic Workers*, 811 S.W.2d 875, 879 (Tenn. 1991)). Thus, absent mutual assent to the essential terms of a claimed settlement agreement, the agreement cannot be enforceable. *State v. Clements*, 925 S.W.2d 224, 227 (Tenn. 1996). The intent of the parties to a writing or writings is determined from the totality of the written terms, taken as

a whole, in the context of the surrounding circumstances. *See Fort Sanders Reg'l Med. Ctr. v. Collins*, No. 03A01-9202-CH-00041,1992 WL 184682, at *1 (Tenn. Ct. App. Aug. 5, 1992).

We first address whether the correspondence between the parties reflects a meeting of the minds sufficient to constitute an enforceable agreement. TII argues that there was no such meeting of the minds in this case, because Plaintiffs focused on the inclusion of the $575,000 figure in the settlement offer and ignored the limiting language indicating that the offer was for policy limits and that the specified amount was only an estimate. At best, TII contends, there was a mutual mistake. It maintains that the $575,000 figure specified in the offer, "[w]hile mistakenly overstated, was an estimated figure, qualified by the realities of eroding policy limits, a looming trial date, and the attendant preparations of Defendant's counsel of which Plaintiffs' counsel was keenly aware." Thus, inclusion of the $575,000 figure was not intended to mislead Plaintiffs, nor was it an error that can be charged to TII.

TII argues that this situation is similar to that in *Perry v. Winn-Dixie Stores, Inc.*, No. E2001-00523-COA-R3-CV, 2002 WL 313152 (Tenn. Ct. App. Feb. 28, 2002). In *Perry*, a slip-and-fall case, the plaintiff had sued the defendant for personal injuries he sustained in the defendant's store. After a jury verdict was returned, the parties continued to negotiate a settlement in lieu of the plaintiff filing an appeal. The amount of the judgment, $15,300,[3] was deposited by the defendant with the trial court. This amount was later withdrawn by the plaintiff. The defendant's new attorney offered the plaintiff $20,000 in full and final settlement of the claim. There was no discussion at that time about the money the Plaintiff had already received. The plaintiff accepted the offer.

Later the parties disagreed on whether the $20,000 settlement would be "new money" or whether it included the $15,300 already paid to the plaintiff. After the defendant's counsel learned that the plaintiff had already been paid $15,300, he wrote a check to the plaintiff for $4,700, rather than the full $20,000. *Perry*, 2002 WL 313152, at *5. The plaintiff filed a motion to enforce the settlement agreement of $20,000 over and above the $15,300 he had already been paid.

The trial court denied the Plaintiff's motion to enforce the agreement for $20,000 in addition to the $15,300. It concluded, among other things, that "there was no meeting of the minds as to what was being offered and therefore it could not be enforced under general contract principles." *Id.* at *6. The plaintiff appealed. On appeal, the appellate court agreed with the decision of the trial court:

> According to [plaintiff's counsel's] testimony, he believed Plaintiff was offered $20,000.00 over and above the $15,300.00 already paid. On the other hand, [defendant's counsel] testified that at no time did he ever have any settlement authority in excess of $20,000.00 total in which to settle the whole case. . . . We find no reversible error in the Trial Court's conclusion that there was no meeting of the

---

[3]This was the amount of the judgment after comparative fault was applied to the total amount of the jury verdict.

minds with regard to what was offered in the settlement negotiations, and affirm the Trial Court's conclusion on this issue.

*Id.* at *7. In reaching this conclusion, the appellate court gave due deference to the trial court's assessment of the witnesses and its determination of their credibility. The trial court had determined that counsel for the plaintiff actually believed that he was offered $20,000 over and above the $15,300 amount already paid. Likewise, counsel for the defendant believed that the offer was for a total of $20,000, because he had no authority to settle the entire case for anything in excess of that amount. Defense counsel's sincere belief that he had offered a total of $20,000 was supported by the undisputed fact that he was unaware of that the plaintiff had already been paid $15,300. Under those circumstances, the appellate court concluded that each party had misunderstood the position of the other, and that, therefore, "there was no meeting of the minds with regard to what was offered in the settlement negotiations." *Id.*

In this case, Plaintiffs contend that TII either made a unilateral mistake in offering a settlement amount that exceeded the authorized amount, or that TII intentionally engaged in a "bait and switch" by reneging on their initial offer of $575,000. Plaintiffs argue in their brief that "[s]ettlement discussions with Mrs. Crider occurred over the phone. Money was the issue." When they received Crider's offer, they claim, "Plaintiffs finally had a figure to discuss." Plaintiffs argue that the plain language of the May 10 letter reflected a liquidated settlement offer of $575,000, and that the agreement was formed when Plaintiffs accepted that offer. They assert that Crider had the authority to bind TII, and that TII must honor the agreement formed between Crider and Plaintiffs.

We disagree with the Plaintiffs' characterization of the language in the parties' correspondence. The May 10 offer letter states at the outset that Crider was "authorized to offer you the remaining limits under [TII's] insurance policy . . . ." Crider closed the paragraph with the same qualification, that TII "really [does] not have anything to offer beyond [its] limits and any excess judgment is not collectible." Certainly, the letter includes an estimated dollar amount for Plaintiffs' consideration, stating that "[t]here is approximately $575,000 remaining on the insurance policy *at this point*." (Emphasis added). However, it is undisputed in the record that the Plaintiffs were aware that the policy had eroding limits, and that it continued to erode as the trial preparation progressed. Crider's affidavit, which is unchallenged in the record, states clearly that Crider informed Plaintiffs' counsel about the mock trial that was to take place on the day that the offer was made. The affidavit asserts that Crider told Plaintiffs' counsel that she "would have to continue to prepare for trial, which would continue to erode the [policy] limits . . . ." According to Crider's affidavit, Plaintiffs' counsel asked Crider if TII would keep its offer of "policy limits" open for forty-eight hours, and Crider agreed to keep the offer of "policy limits" open until May 13, 2004. Since Plaintiffs did not dispute the accuracy of Crider's affidavit, we assume the assertions therein to be true in assessing the trial court's decision.

In our view, an ambiguity arose when Plaintiffs requested, and TII agreed, to keep "the offer" open for forty-eight (48) hours. At that point, it was unclear what "offer" was on the table. The Plaintiffs apparently interpreted the offer to be $575,000, while TII believed the offer was for an as-

yet undetermined amount, the remaining policy limits available at the time the offer was made. The ambiguity continued in the "keep the offer open" conversation, since neither party mentioned a specific dollar amount and the parties did not include any such language in their writings regarding keeping the offer open. Most importantly, the Plaintiffs did not obtain any kind of "stand still" agreement, whereby the amount of the offer pursuant to the withering limits policy would stay the same while the Plaintiffs considered whether to accept it. The Plaintiffs apparently assumed that "keeping the offer open" would amount to such as agreement; however, in the face of Crider's admonitions that they would continue incurring trial preparation expenses, it would not. Therefore, the two key ambiguities were (1) the initial amount of the offer and (2) whether that initial offer amount would remain unchanged while the Plaintiffs considered it. Under these circumstances, we must conclude that the parties did not have a meeting of the minds as to the essential terms of a settlement agreement, and that the trial court's decision to enforce the agreement must be reversed.

The decision of the trial court is reversed. Costs on appeal are to be taxed equally to Appellees Richard Petersen and Karen Fosmire, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE