# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### August 31, 2011 Session

## ALLSTATE INSURANCE COMPANY v. DIANA LYNN TARRANT ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Sevier County**
**No. 0810463      Telford Forgety, Chancellor**

---

**No. E2009-02431-SC-R11-CV - Filed March 26, 2012**

---

WILLIAM C. KOCH, JR., J., dissenting.

We granted the Tenn. R. App. P. 11 application in this case to determine whether an insured, who requested replacement insurance coverage on his personal and business vehicles in order to reduce his premiums, is entitled to more coverage than that provided in his new personal policy when he failed to read the amended policy declarations and to notify the insurance company that he desired different coverage on one of his vehicles. Applying settled legal principles to the essentially undisputed facts of this case, I would hold that the insured accepted the new coverage by failing to review the amended policy declarations and to give the insurance company timely notice that the coverage was less than he desired.

## I.

John Tarrant owns and operates Blue Ribbon Cleaning, Inc. ("Blue Ribbon"), a cleaning business that requires the use of a number of vehicles. Since 1990, he obtained the insurance for his commercial vehicles and his personal vehicles from Allstate Insurance Company ("Allstate") through the Lonnie Jones Insurance Agency in Knoxville. This insurance was provided in two policies – one for his commercial vehicles and one for his personal vehicles. The commercial policy had a combined liability limit of $500,000; while the personal policy had $100,000/$300,000/$100,000 liability limits.

In 2003, Mr. Tarrant transferred a number of his vehicles from his personal policy[1] to a commercial fleet policy[2] in order to obtain a discount on his premiums. These changes

---

[1] The personal insurance policy is in the name of "John H. Tarrant."

[2] The commercial insurance policy shares the same mailing address as the personal policy but is in
(continued...)

took effect on April 4, 2003. One of the vehicles transferred to the commercial fleet policy was a 2002 Chrysler Town & Country minivan that was regularly driven by his wife and that was used for both personal and business purposes.

Mr. Tarrant's commercial fleet policy came up for renewal in 2005. On January 27, 2005, Allstate mailed Mr. Tarrant a renewal package stating that the renewal premium would be $7,024 per year. Later, on March 16, 2005, Allstate mailed a bill to Mr. Tarrant stating that the renewal premium was $6,359. Upon receiving this renewal notice, Mr. Tarrant told Lonnie Jones that he desired a lower premium.[3]

Mr. Jones asked Patricia Smith, one of his employees, to work with Mr. Tarrant to lower his premiums. Mr. Tarrant later testified that he requested Ms. Smith to "put all of the vans in the commercial line" and to move the other vehicles to his personal policy. Ms. Smith testified that she would not have moved the 2002 Chrysler minivan regularly driven by his wife to the personal policy unless Mr. Tarrant had asked her to do so. Accordingly, when she requested Allstate to revise the coverage for Mr. Tarrant's vehicles, the 2002 Chrysler minivan was moved from the commercial fleet policy to Mr. Tarrant's personal policy.

These changes in coverage saved Mr. Tarrant approximately $3,000 in premiums. Ms. Smith telephoned Mr. Tarrant to confirm the new premium but did not discuss the specific coverage of each vehicle at that time. After Mr. Tarrant approved the new premium, Ms. Smith finalized the coverage in Allstate's computer with an effective date of April 4, 2005 – the renewal date of the commercial fleet policy.

On March 25, 2005, Allstate mailed Mr. Tarrant a computer-generated letter stating:

> We've sent along this mailing to verify the changes to your policy that you recently requested. . . . Please look over all the information in this mailing, and call us right away if you have any questions or if anything isn't exactly right.

The letter also summarized the changes in Mr. Tarrant's coverage. Among the changes in coverage noted in the letter were "[a] change in insurance coverage for your 02 Chrysler Town-Country" and "[a] change in description for your 02 Chrysler Town-Country." The

_____

[2](...continued)
the name of "Blue Ribbon Cleaning Inc."

[3]Mr. Jones testified that Mr. Tarrant told him "if you can't beat this [renewal premium], I'm going to leave you."

letter also referred to an "accompanying Amended Policy Declarations" that more thoroughly explained the changes. The amended auto policy declarations included a cover page showing each vehicle on the personal policy with its premium, as well as a separate page for each vehicle showing the liability coverages for that vehicle. The 2002 Chrysler minivan's page clearly states that the liability limit for that vehicle is $100,000/$300,000/$100,000, and lists the policy number for the personal policy.

Mr. Tarrant received four bills from Allstate during the months leading up to his wife's June 17, 2005 accident in the 2002 Chrysler minivan. Two bills, dated April 15 and May 16, 2005, and addressed to Blue Ribbon, related to Mr. Tarrant's commercial insurance policy. The 2002 Chrysler minivan was not one of the vehicles listed on those bills. During the same period, on April 20 and May 20, 2005, Allstate mailed Mr. Tarrant two bills regarding his personal insurance policy. Both of these bills reflected that the 2002 Chrysler minivan was one of the vehicles covered by the personal policy. In addition to these bills, Mr. Tarrant also received another amended policy declaration for his personal insurance policy in May 2005 after he removed his son as a driver on his personal policy.

Even after his wife's accident in the 2002 Chrysler minivan in June 2005, Mr. Tarrant continued to pay the premiums on his personal policy that provided insurance coverage for the Chrysler minivan. Despite the accident, he never questioned the fact that the minivan was covered by his personal policy rather than his commercial policy. Mr. Tarrant removed the 2002 Chrysler minivan from his personal policy in May 2006 only because he traded in the minivan for another vehicle. It was not until the litigation regarding the accident was underway that Mr. Tarrant took issue with the coverage of the 2002 Chrysler minivan under his personal policy.

Allstate filed an action in the Chancery Court for Sevier County seeking a declaratory judgment regarding whether Mr. Tarrant's 2002 Chrysler minivan was covered under his personal policy or under his commercial policy. The trial court conducted a bench trial on September 22, 2009. Allstate's position at trial was that the coverage on Mr. Tarrant's personal and commercial vehicles was precisely the coverage he had requested[4] and that the change in coverage was accurately and repeatedly reflected in the many mailings that were sent to Mr. Tarrant. An employee from Allstate's corporate office provided a list of all

---

[4]Ms. Smith, whom the trial court later found to be credible, testified that she moved the 2002 Chrysler minivan from Mr. Tarrant's commercial policy to his personal policy because Mr. Tarrant told her to. When asked, "Why did you move the Town and Country van to the personal lines policy?", Ms. Smith replied, "Because Mr. Tarrant requested that I do that." When later asked, "Is it true, Ms. Smith, that Mr. Tarrant actually requested that these three vehicles be moved?", Ms. Smith responded, "Yes, or I would not have done it otherwise."

mailings to Mr. Tarrant regarding his policies and confirmed that all these materials had been mailed.

For his part, Mr. Tarrant insisted that he never requested that the 2002 Chrysler minivan be removed from his commercial policy. He stated that he was "always . . . very clear" and that he said "the things that I want done in a manner that is not easily misinterpreted." However, he conceded that his instructions "to put all of the vans under the commercial policy . . . may have been the reason that they [misunderstood] the directions."

Even though Mr. Tarrant could not recall receiving Allstate's March 25 letter,[5] the trial court later found that Allstate had mailed the letter.[6] Mr. Tarrant also conceded that he did not go through or look at all the materials that Allstate sent to him[7] because his daughter served as his secretary, and she "would make out the bills and have them ready for me to sign and at a glance I would sign them like any business would and send them on." One of the recurring themes in Mr. Tarrant's case was that most business persons do not read communications from their insurance companies regarding their insurance coverage.[8]

The trial court announced its decision from the bench following the trial on September 22, 2009. The trial court commented that it believed that all the witnesses who had testified

---

[5]When the trial court asked him directly, "Did you get that letter?", Mr. Tarrant replied, "I don't remember getting a letter like that."

[6]During its findings from the bench, the trial court stated:

It's clear it was mailed out to Mr. Tarrant before the renewal date of the commercial policy which was April 4th. It's clear it was mailed to him. Now, he said I don't recall having gotten the letter. He didn't say he didn't get it. And once again, good for him, good for him . . . . But it's clear to me that the letter went out.

[7]When asked, "How much time do you take to look at that bill and review it and see what's on it and what's not on it?", Mr. Tarrant responded, "Well, with all the insurance forms and loans we pay, all the premiums we pay, honestly, I don't go though it and look at every little thing in it."

[8]After noting that the renewed notices "came with 25 or 30 pages," Mr. Tarrant's lawyer argued:

The reason it's an issue, your Honor, is just because the example I used the January 27th letter is an exhibit and it includes behind it the commercial policy renewal and included in that is many, many, many pages. Buried in that somewhere could be other information that if you had it all, you would know that.

The truth is none of us ever sit down and read all of the pages that come in all these envelopes. Maybe we've learned a good lesson today and maybe now we will.

– including Mr. Tarrant, Mr. Jones, and Ms. Smith – were credible and that the court was "impressed . . . with the honesty and straightforwardness."

After thoroughly reviewing the testimony, the trial court stated that "the case may boil down to just nothing more than a misunderstanding about what one side honestly meant one thing about the word van and the other side honestly understood another thing about it."[9] Accordingly, the trial court found that "the preponderance of the evidence here lies that even if it was a misunderstanding, even if that's all it was, and I'm satisfied . . . it is nothing more than a good faith misunderstanding about what the meaning of the word vans was."[10] Based on this finding of fact, the trial court held as follows:

> Even if that's all it was, I'm constrained to hold that Mr. Tarrant and Blue Ribbon were notified by this March 23rd letter of the change and from which they . . . should have known if it was a misunderstanding, that, yes, there is a misunderstanding.
>
> And in addition to that they were notified by multiple additional mailings between March and the date of this accident in July[11] from which they could have known and should have known that there had been a misunderstanding.
>
> So the Court is also constrained to hold that Mr. Tarrant and Blue Ribbon [had] ratified the change even if it was nothing

---

[9]The trial court observed earlier that "according to Mr. Tarrant what he told them at the Jones agency was look . . . put the vans on the commercial policy, put the other vehicles on the personal policy. Well, maybe . . . this case only comes down to a misunderstanding about the definition of the word van."

[10]While the Court discusses other portions of the trial court's ruling from the bench, it does not address this particular finding, even though it is the lynchpin of the trial court's decision. Rather, the Court dismisses the existence of a good faith misunderstanding between Mr. Tarrant and Ms. Smith as mere speculation without evidentiary support. I respectfully disagree. Mr. Tarrant himself alluded to the possibility that his instructions "to put all of the vans under the commercial policy . . . may have been the reason that they [misunderstood] the directions." When making findings of fact, trial judges may appropriately draw inferences that are permissible deductions from the evidence. *See Sudduth v. Williams*, 517 S.W.2d 520, 520 (Tenn. 1974); *Morrison v. James*, 201 Tenn. 243, 245-46, 298 S.W.2d 714, 715 (1957); *Bell Cab & U-Drive-It Co. v. Sloan*, 193 Tenn. 352, 357, 246 S.W.2d 41, 44 (1952). An objective reading of the entire testimony of Mr. Tarrant and Ms. Smith concerning their conversations about the changes in Mr. Tarrant's insurance coverage on the "vans" provides ample basis for the trial court's finding by a "preponderance of the evidence" that "it is nothing more than a good faith misunderstanding about what the meaning of the word vans was."

[11]The accident actually occurred in June 2005, but the trial court's mistake in the date of the accident does not undermine the legal integrity of its decision.

more than a mere understanding, he's ratified it because he was notified by the March letter and some four or five additional mailings before this accident happened that specifically contained the information.

\*   \*   \*

For all of the foregoing reasons, as the Court told you at the beginning of its remarks, the Court's constrained to hold that the complaint for declaratory judgment is sustained and the Court holds that the coverage on the '02 Chrysler Town and Country minivan is that provided by the Tarrants['] personal policy of insurance as opposed to their commercial policy of insurance.  (footnote added)

The Tarrants appealed the trial court's judgment.  The Court of Appeals reversed the trial court's judgment and concluded that the 2002 Chrysler minivan was covered by Mr. Tarrant's commercial policy rather than his personal policy.  *Allstate Ins. Co. v. Tarrant*, No. E2009-02431-COA-R3-CV, 2010 WL 4188232, at \*10 (Tenn. Ct. App. Oct. 21, 2010).

Rather than directly addressing the factual and legal foundation of the trial court's decision – that Mr. Tarrant "ratified" the replacement coverages by failing to notify Allstate that there was an error in the coverage on the 2002 Chrysler minivan – the Court of Appeals considered the concept of "ratification" in a completely different context.  Instead of focusing on whether Mr. Tarrant had "ratified" or accepted the new insurance coverage, the Court of Appeals addressed whether Ms. Smith was acting as Mr. Tarrant's agent in the procurement of the new coverage and, if so, whether he had ratified her acts.  Relying on Tenn. Code Ann. § 56-6-115(b) (2008),[12] the Court of Appeals determined that Ms. Smith was acting as Allstate's agent, not Mr. Tarrant's agent, when she obtained the replacement insurance coverage.  Therefore, the Court of Appeals held that Mr. Tarrant could not, as a matter of law, be held to ratify Ms. Smith's work.  *Allstate Ins. Co. v. Tarrant*, 2010 WL 4188232, at \*6-8.

---

[12]Tenn. Code Ann. § 56-6-115(b) provides:

An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary.  This subsection (b) shall not affect the apparent authority of an agent.

-6-

## II.

To the extent that a contracts case involves questions of fact, reviewing courts must review the trial court's factual findings de novo with a presumption of correctness. Tenn. R. App. P. 13(d); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). A reviewing court may only disturb the trial court's factual findings when the evidence preponderates against them. Tenn. R. App. P. 13(d); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 n.5 (Tenn. 2011).

Conversely, the interpretation of a contract is a legal question that this Court reviews de novo without a presumption of correctness. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *see also Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). When interpreting a contract, we must strive "'to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d at 95); *accord Hill v. Tennessee Rural Health Improvement Ass'n*, 882 S.W.2d 801, 802 (Tenn. Ct. App. 1994). Insurance contracts are interpreted using these same principles of contract interpretation. *Purkey v. American Home Assurance Co.*, 173 S.W.3d 703, 705 (Tenn. 2005); *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (citing *Phillips v. United Servs. Auto. Ass'n.*, 146 S.W.3d 629, 633 (Tenn. Ct. App. 2004)).

## III.

Insurance policies are, at their core, contracts. *See Artress v. State Farm Fire & Cas. Co.*, 221 Tenn. 636, 639-40, 429 S.W.2d 430, 432 (1968); *John Weis, Inc. v. Reed*, 22 Tenn. App. 90, 98, 118 S.W.2d 677, 682 (1938). Accordingly, when courts are called upon to interpret them, the analysis must be grounded in the principles of contract law. *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn. 2005). Like all contracts, "[t]he formation of insurance contracts generally follows the traditional offer-and-acceptance model of the common law." 1 Jeffrey E. Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law* § 3.01[1][a], at 3-4.1 to 3-5 (Law Library ed. 2011) (hereinafter "*New Appleman on Insurance Law*"); *see also Woodfin v. Neal*, 16 Tenn. App. 481, 488, 65 S.W.2d 212, 216 (1933) ("Insurance is effected by an offer and acceptance, that is, by an application and acceptance by the issuance of the policy, or by the issuance of a policy accepted by the insured."). Similarly, "[r]enewal contracts have the same requirements of mutual assent, offer and acceptance and new consideration as other contracts." 1 *New Appleman on Insurance* § 3.07[1], at 3-54.

Insurance policies consist of several parts, including the declarations page, the policy form, and the endorsements. 3 *New Appleman on Insurance Law* § 16.09[1][a], at 16-195.

-7-

The declarations page sets forth the most basic facts regarding the policy, including the identity of the insured, the persons or property insured, the policy period, the amount of insurance and the limits for each coverage, and the premium charges. 3 *New Appleman on Insurance Law* §§ 16.09[1][b], at 16-195, 21.01[1], at 21-3 to -4. The declarations page summarizes the essential terms of an insurance policy. *Todd v. Missouri United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo. 2007) (en banc); *Bergmann v. Hutton*, 101 P.3d 353, 359 (Or. 2004) (en banc). It is commonly understood that the declarations page is the one page in an insurance policy that will most likely be read and understood by the insured, "and contains the terms most likely to have been requested by the insured." *See* 16 Richard A. Lord, *Williston on Contracts* § 49:25, at 139 (4th ed. 2000); *see also Simalton v. AIU Ins. Co.*, 643 S.E.2d 553, 555 (Ga. Ct. App. 2007); *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1270 (N.J. 2001); *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999-1000 (R.I. 1989).

The declarations pages of Mr. Tarrant's insurance policies are the most important documents with regards to the coverage dispute in this case. These pages are, both in law and in fact, part of Mr. Tarrant's insurance policies and, therefore, part of the contract of insurance between Mr. Tarrant and Allstate.[13] Thus, it is of little consequence that the record does not reflect clearly that Allstate provided Mr. Tarrant with new copies of his auto insurance policies or the endorsements which were apparently unchanged. Allstate provided Mr. Tarrant with all the information he needed to ascertain the coverage on the 2002 Chrysler minivan when it sent him – on two occasions – the Amended Auto Policy Declarations.

There are two reasons why Mr. Tarrant is not entitled to coverage for the 2002 Chrysler minivan under the higher limits of his commercial policy. First, there was a failure of mutual assent of which Mr. Tarrant, and not Allstate, should have been aware. Second, Mr. Tarrant unconditionally accepted Allstate's proposal to provide him with replacement coverage for his commercial and personal vehicles.

## A.

It is black letter law that in order for a contract to be consummated, the parties must mutually assent to the material terms. *See* Arthur M. Kaufman & Ross M. Babbitt, *The Mutuality Doctrine in the Arbitration Agreements: The Elephant in the Road*, 22 Franchise L.J. 101, 102 (2002). Tennessee courts have referred to this requirement as a "meeting of the minds." *Staubach Retail Servs.-S.E., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn.

---

[13]The Amended Auto Policy Declarations state: "Your auto policy consists of this Policy Declarations and the documents listed below. Please keep these together. -Tennessee Amendatory Endorsement form AU10704 -Tennessee Auto Policy form AU141 -Loss Payable Clause Endorsement form AU166."

2001)). A meeting of the minds is determined "by assessing the parties' manifestations according to an objective standard." *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007); *see also Paragon Refining Co. v. Lee*, 98 Tenn. 643, 644-49, 41 S.W. 362, 363-64 (1897); Black's Law Dictionary 124 (8th ed. 2004) ("In modern contract law, mutual assent is determined by an objective standard – that is, by the apparent intention of the parties as manifested by their actions."). The traditional common-law rule is that where mutual assent is lacking, no contract was ever formed. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991) ("The facts of this case, plainly and simply, fail to establish mutual assent. Hence, no contract between the parties ever arose."); *accord* Restatement (Second) of Contracts § 17 & cmt. c (1981); *see generally* 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 4:5, at 277-78 (2006).

The requirement of mutual assent – or a meeting of the minds – is best illustrated by the well-known case of *Raffles v. Wichelhaus*, (1864) 159 Eng. Rep. 375 (Exch.). In that case, the parties contracted for the sale of cotton "'to arrive ex Peerless from Bombay.'" *See* Benjamin Alarie*, Mutual Misunderstanding in Contract*, 46 Am. Bus. L.J. 531, 531 (2009) (hereinafter "Alarie") (quoting *Raffles v. Wichelhaus*). Unbeknownst to the contracting parties, there were two ships named "Peerless" arriving from Bombay at different times. When the buyer refused to accept the later shipment, the English Court of Exchequer held that there was a "latent ambiguity" in the parties' contract and consequently, that there was no binding contract. Alarie, 46 Am. Bus. L.J. at 531.

As Professor Alarie has noted, "[s]ince that time it has been generally accepted in Anglo-American common law that unenforcement is the natural outcome in cases involving mutual misunderstanding." Alarie, 46 Am. Bus. L.J. at 531; *accord* Restatement (Second) of Contracts § 20(1). The Restatement contains an exception to the general rule, however, where "[one] party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party." Restatement (Second) of Contracts § 20(2)(b); *see also* 1 Joseph M. Perillo, *Corbin on Contracts* § 4.13, at 636 (Revised ed. 1993) ("[I]f it is made clear that there has in fact been no such 'meeting of the minds,' the court will not hold a party bound by a contract varying from the party's own understanding unless this party's words and conduct were in a context giving the party reason to know that the other party would be and was in fact misled.")

The trial court based its decision on its factual finding that the parties' coverage dispute arose from a "good faith misunderstanding" regarding the meaning of the word "vans."[14] Like the parties in *Raffles v. Wichelhaus* who genuinely attached a different

---

[14]Like the Court of Appeals, this Court has decided that the evidence can support only one finding
(continued...)

-9-

meaning to the term "Peerless," the trial court found that the parties here genuinely attached a different meaning to the term "vans." Apparently Ms. Smith, Allstate's agent, understood "vans" to mean only the full size vans; while Mr. Tarrant intended that his reference to "vans" include the 2002 Chrysler minivan.

However, because of a material factual difference between this case and *Raffles v. Wichelhaus*, the outcome in this case cannot be the same as the outcome in *Raffles v. Wichelhaus*. This difference stems from the fact that each party in *Raffles v. Wichelhaus* lacked reason to know that the other party's understanding of the operative word differed from theirs. The same cannot be said for Mr. Tarrant. While both parties in *Raffles v. Wichelhaus* were unaware that two ships named "Peerless" were sailing from Bombay, in this case, Mr. Tarrant had good reason to know that Allstate's understanding of the word "vans" differed from his own.[15] Accordingly, the exception in Restatement (Second) of Contracts § 20(2)(b) to the general rule that no contract exists applies in this case.

Between the time that Mr. Tarrant requested changes in his insurance coverage in order to reduce his premiums and Ms. Tarrant's accident, Allstate mailed him four separate bills and two amended policy declarations. Even if Mr. Tarrant failed to receive one of the amended policy declarations, there were still at least five other Allstate mailings prior to the accident that should have put him on notice that Allstate's understanding of the term "vans" was not the same as his. These mailings clearly differentiated between Mr. Tarrant's commercial insurance coverage and his personal insurance coverage. In addition, each of the mailings always identified each of the vehicles covered by the particular policy. The 2002 Chrysler minivan was never listed as one of the vehicles covered on the commercial insurance policy and was always listed as one of the vehicles covered on the personal policy.

Had Mr. Tarrant undertaken even the most cursory examination of the numerous communications from Allstate regarding these policies, he would have quickly ascertained that Ms. Smith's, and therefore, Allstate's, understanding of the term "vans" differed from his own. Yet this record shows with little contradiction that neither Mr. Tarrant nor his

---

[14](...continued)
– that Allstate made a mistake – and has rejected the trial court's finding that these parties had a "good faith misunderstanding." The trial court found that Ms. Smith, like Mr. Tarrant, was credible. Using the standard required by Tenn. R. App. P. 13(d), I would find that the evidence simply does not preponderate against the trial court's finding that the parties had a "good faith misunderstanding."

[15]In addition, persons seeking insurance have an obligation to be clear in their communications with the insurance company regarding the coverage they are seeking. When it is not clear what insurance coverage the client requested the insurance company's agent to obtain, the client may not recover for the agent's failure to procure the insurance. *See Coble Sys., Inc. v. Gifford Co.*, 627 S.W.2d 359, 364 (Tenn. Ct. App. 1981).

daughter reviewed the policies other than to determine the amount of the premium. Were it not for this oversight, they could very easily have alerted Allstate to their disagreement regarding the coverage on the 2002 Chrysler minivan and could have obtained the coverage that Mr. Tarrant desired. Based on the facts of this case, as properly found by the trial court, I cannot fault Allstate for understanding that Mr. Tarrant's instruction to include the "vans" on his commercial policy did not include the 2002 Chrysler minivan. Rather, I would hold that, because of his inaction, Mr. Tarrant is bound by Allstate's understanding of the word "van" and that the coverage for the 2002 Chrysler minivan is provided by his personal policy.

**B.**

There is a second line of reasoning supporting the conclusion that Mr. Tarrant's personal insurance policy provides the coverage for the 2002 Chrysler minivan. As a general matter, when a party seeking insurance completes an application and submits it to the insurer, the application constitutes an offer to enter into an insurance contract. *Arnold v. Locomotive Eng'rs Mut. Life & Accident Ins. Ass'n*, 30 Tenn. App. 166, 172, 204 S.W.2d 191, 194 (1946); 1 *New Appleman on Insurance* § 3.01[1][a]; 1A Steven Plitt et al., *Couch on Insurance* §§ 11:1, 11:4 (3d rev. ed. 2010) (hereinafter "*Couch on Insurance*"). But this role "can be reversed where the insured requests coverage and a proposal is issued from an insurance agent with the power to bind the insurer. In such circumstances, the proposal constitutes an offer which the insured must unconditionally accept for the policy to go into effect." 1 *New Appleman on Insurance* § 3.01[1][f], at 3-23. Alternatively, the insurer's proposal may constitute a counteroffer that the insured must accept, "usually, by payment of the first premium," and "in many . . . cases, the insured's acceptance will be signified by raising no objection to the policy terms." 1 *New Appleman on Insurance* § 3.01[1][f], at 3-23; *see also* 1A *Couch on Insurance* § 16:1, at 16-3 ("The delivery of a policy that does not accord with the application for insurance is in the nature of a counteroffer that must be accepted by the applicant in order to constitute a binding contract.").

The power of acceptance for a renewal contract thus lies in the insured. *See Richmond v. Travelers' Ins. Co.*, 123 Tenn. 307, 310, 130 S.W. 790, 790 (1910) ("The letter of September 2d, written by the agents . . . containing the renewal receipt, simply amounted to an offer on the part of the company to renew the insurance for the ensuing six months. This was, of course, open to the acceptance or rejection of [the insured]."); 1 *New Appleman on Insurance* § 3.07[1], at 3-54 ("[T]he insurer is considered to make an offer of a renewal policy, which the insured can accept or reject."). If the insured fails to accept an offer to renew, or rejects the offer, there is no contract. *See Richmond v. Travelers' Ins. Co.*, 123 Tenn. at 317, 130 S.W. at 792 (holding that there was no contract because the insured failed to accept the offer of renewal).

-11-

As Judge Crownover noted over seventy-five years ago,

> The issuance of a policy with terms different from those of the
> application is a counter proposition, which if accepted by the
> insured becomes a binding contract subject to all its terms.  It
> becomes a binding contract in the absence of fraud or mistake,
> and the insured is presumed to have agreed to all its terms.

*Woodfin v. Neal*, 16 Tenn. App. at 488, 65 S.W.2d at 216 (citations omitted); *see also National Life & Accident Ins. Co. v. Carmichael*, 53 Tenn. App. 280, 286, 381 S.W.2d 925, 928 (1964) (quoting 2 A.L.R.2d 943).  As one prominent treatise explains,

> Where the insured receives a policy not conforming
> exactly to the one desired, he or she may either accept it or reject
> it.  But if he [or she] desires to reject it, he [or she] must act
> within a reasonable time, so that his [or her] retention of the
> policy beyond a reasonable time will not be taken as an
> acceptance of it.

3 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 14.6, at 236 (2d ed. 1998).  An insured therefore has a duty to read his or her policy and is conclusively presumed to have full knowledge of its contents.[16]  *See Kiser v. Wolfe*, 353 S.W.3d 741, 749  (Tenn. 2011); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 274 (Tenn. 2001); 1 *New Appleman on Insurance Law* § 3.01[1][c], at 3-14; *see also* 1A *Couch on Insurance* § 16:1, at 16-4 ("Opportunity to ratify or waive any inconsistent provisions, or to accept the form of policy delivered, as well as actual acceptance of the altered contract, is essential to the making of a valid contract on the basis of the nonconforming policy." (footnotes omitted)).

This is a logical and fair requirement because:

> insureds are often in the best position to verify that the essential
> policy terms are what they expected, that they conform with
> their application and intent, and that the policy conforms with
> the representations about coverage by the agent.  This rule also
> is designed to identify any clerical errors in the policy and to

---

[16]This view is shared by many other states.  *See, e.g.*, *McHoney v. German Ins. Co.*, 52 Mo. App. 94, 96-98 (1892); *Phillis Dev. Co. v. Commercial Standard Ins. Co.*, 457 P.2d 558, 559 (Okla. 1969); *Bostwick v. Mutual Life Ins. Co. of N.Y.*, 89 N.W. 538, 540-41 (Wis. 1902).

ensure that the insurer has not issued a counteroffer. (footnotes omitted)

1 *New Appleman on Insurance Law* § 3.01[1][c], at 3-14.

The Court has determined that Ms. Smith was legally the agent of Allstate and that she mistakenly moved the insurance coverage on the 2002 Chrysler minivan from Mr. Tarrant's commercial insurance policy to his personal insurance policy. Even if both of these statements are true, the Court's conclusion that Allstate must provide coverage for the 2002 Chrysler minivan under Mr. Tarrant's commercial policy is inconsistent with basic contract principles.

There are three ways to view the negotiations between Allstate and Mr. Tarrant. First, Mr. Tarrant's request for a change in coverage could be considered to be his offer to purchase insurance at a reduced premium. In this context, the policy changes issued by Allstate constitute both a rejection of Mr. Tarrant's offer and a counteroffer. Second, the coverage Allstate proposed in response to Mr. Tarrant's inquiry about reducing his premiums could be viewed as an offer from Allstate. *See* 1 *New Appleman on Insurance* § 3.01[1][f], at 3-23. Third, Allstate's initial renewal notice could be construed as an offer from Allstate which Mr. Tarrant rejected when he made a counteroffer requesting that all the "vans" be insured under this commercial policy. Allstate's issuance of the policy changes would then amount to a rejection of Mr. Tarrant's counteroffer and a new counteroffer by Allstate. Each of these views inescapably leads to the conclusion that the power of acceptance was always in Mr. Tarrant's hands.

There can be little dispute that Mr. Tarrant had a reasonable time either to dispute the terms of his replacement insurance coverage as reflected in the amended policy declarations or to decide to accept the coverage that the replacement policy declarations provided. Had Mr. Tarrant disputed the coverage provided in the amended declarations, this dispute would have amounted to a rejection of the terms of the new policies, and the parties could have entered into a new insurance agreement on other mutually acceptable terms.

Mr. Tarrant does not dispute that he received four bills and at least one amended policy declaration after he requested changes in his coverage. The letter accompanying the amended policy declaration clearly asked him to review the new policies and to communicate with Allstate "right away" if "anything isn't exactly right."[17] This letter also succinctly stated:

---

[17]More specifically, the letter stated: "We've sent along this mailing to verify the changes to your policy that you recently requested. The changes took effect on 04/04/05. Please look over all the information in this mailing and call us right away if you have any questions or if anything isn't exactly right."

> The accompanying Amended Policy Declarations includes these changes:
>
> The addition of your 03 Dodge Trk Dr3500 2wd.
> The addition of your 95 Lexus Es300.
> A change in insurance coverage for your 02 Chrysler Town–Country.
> A change in description for your 02 Chrysler Town–Country.
> The addition of the passive restraint discount 02 Chrysler Town–Country.
> The deletion of one or more operators.
>
> Your premium for the current policy period has been increased by a total of $573.26.

The amended policy declaration itself included a cover page displaying the covered vehicles, including the 2002 Town & Country, as well as the premium adjustments. Following the cover page was an individual page for each vehicle, including the 2002 Town & Country, which clearly showed the liability limits for the 2002 Town & Country were limited to $100,000/$300,000/$100,000.

Despite receiving ample notice of the changes in his replacement coverage, Mr. Tarrant did not take issue with either policy. He simply paid the premiums when they came due and continued to pay these premiums until he traded in the 2002 Chrysler minivan. Well-settled law provides that there are many ways for an insured to manifest intent to accept a insurance coverage, *see* 2 *Couch on Insurance Law* § 29:18, at 29-40, and particularly that "[a]cceptance may also be found in the insured's retention of the renewal policy without objection." 2 *Couch on Insurance Law* § 29:18, at 29-41 to -42 (noting that paying premiums for nearly a year before objecting to the terms of the policy establishes acceptance of the policy). Clearly, Mr. Tarrant objectively manifested his intent to accept the replacement coverage and thereby, in the trial court's words, "ratified"[18] the insurance coverage by paying the premiums in the months leading up to the accident and indeed, almost a year beyond the

---

[18]Both the Court of Appeals and this Court consider the trial court's use of the term "ratify" to be profoundly significant. I view this term as not much more than a red herring. In the context in which the trial court used the term, it is clear that the trial court believed that Mr. Tarrant had accepted the terms of Allstate's replacement insurance coverage. Even if the trial court's use of the word "ratify" reflected its reliance on some other legal principle, it is well-neigh inescapable that the trial court reached the correct result. It is always a reviewing court's prerogative to affirm a trial court's decision on grounds different from those relied upon by the lower court when the lower court has reached the correct result. *State v. Hester*, 324 S.W.3d 1, 21 n.9 (Tenn. 2010); *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986); *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn. 1978).

accident without objection. Consequently, I would affirm the trial court's conclusion that Mr. Tarrant is bound by the terms of the replacement coverage, as reflected in the Amended Auto Policy Declarations and other materials that Allstate sent to him. [19]

Chief Justice Clark has authorized me to state that she concurs in this opinion.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[19]Although this Court has not universally required an insured to read his or her policy in a renewal case, this is not a typical renewal case where the insured may expect to receive an identical policy with only a change in premium. In this case, Mr. Tarrant was negotiating for broad coverage changes and, as an experienced businessman, he should have read the replacement declarations pages to make sure that they provided the coverage he desired, just as Allstate's letter requested him to do.