IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2019 Session

### AMERICAN BOARD OF CRANIOFACIAL PAIN v. AMERICAN BOARD OF OROFACIAL PAIN

**Appeal from the Chancery Court for Davidson County**
**No. 15-4-IV  Russell T. Perkins, Chancellor**

_____

**No. M2018-01696-COA-R3-CV**

_____

Two corporations entered into merger discussions.  Later, one corporation sued the other claiming that an agreement to merge had been reached through the exchange of emails.  The plaintiff corporation requested specific performance of the alleged merger agreement and damages.  On cross-motions for summary judgment, the court concluded on the undisputed facts that there was no meeting of the minds and, thus, no agreement to merge.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., joined.  RICHARD H. DINKINS, J., not participating.

Ronald G. Harris, Nashville, Tennessee, and David H. Simmons and Daniel J. O'Malley, Orlando, Florida, for the appellant, American Board of Craniofacial Pain.

Philip M. Kirkpatrick and Rocklan W. King III, Nashville, Tennessee, and Lucian T. Pera, Memphis, Tennessee, for the appellee, American Board of Orofacial Pain.

### OPINION

### I.

### A.

The American Board of Craniofacial Pain ("ABCP") and the American Board of Orofacial Pain ("ABOP") are professional dental associations.  ABCP, an Illinois

nonprofit corporation, is "organized exclusively to conduct certification examinations [for licensed dentists] in the field of Craniofacial Pain." Certification in the field of Craniofacial Pain earns one the designation "Diplomate of the ABCP."

ABOP, a California nonprofit mutual benefit corporation, "act[s] as an association of licensed professionals in order to conduct certification examinations in the field of Orofacial Pain." Certification in the field of Orofacial Pain earns one the designation "Diplomate of the ABOP."

Although they disagree over who initiated the discussions, both ABCP and ABOP agree that, in the spring of 2014, they started talking about a possible merger of the two entities. The goal was to unify orofacial pain and craniofacial pain dentistry into a single field. With unification, ABCP and ABOP hoped to improve the chances of recognition of the orofacial/craniofacial pain field by the American Board of Dental Specialties or ABDS.

In May 2014, ABCP and ABOP formed a "joint merger committee" composed of three members designated by each entity. Dr. Clifton Simmons, then-president of ABCP, and Dr. Dale Ehrlich, the incoming president of ABOP, both served on the committee for their respective entities.

In June, the joint merger committee held two teleconferences. At the second, the committee discussed a draft "Memorandum of Understanding" or "MOU" that Dr. Simmons had prepared.

On July 14, 2014, prior to the joint committee's next meeting, Dr. Ehrlich sent the following email to Dr. Simmons with the subject line "Merger Proposal":

Clifton,

During our first teleconference we discussed the fact that the committee's work must receive input from, and be approved by, the ABOP Board of Directors. In recent discussions with the Board of Directors there was concern about some of the issues we had discussed. Therefore, the Board has written a proposal for the merger of the ABCP and ABOP. We respectfully submit the attachment which is a merger proposal for your discussion and consideration prior to our Thursday night teleconference. This proposal is our agenda for the next teleconference.

Respectfully,

Dale

2

The attachment referenced in Dr. Ehrlich's email was a two page document, which addressed the combination of the fields, the merger of the entities, and the treatment of diplomates of each entity. The following day, Dr. Simmons responded that he would "take this Proposal to the [ABCP]" and that he did not believe the joint committee needed to proceed with its next conference call.

On July 23, 2014, Dr. Simmons sent an email to the members of the joint merger committee informing them that the board of the ABCP had "voted to accept the ABOP/ABCP Board merger proposal that was sent to us on July 14, 2014." He went on: "I suppose that a Memorandum of Understanding or other document needs to be constructed to consummate this merger of the ABOP and ABCP into one board." The email concludes by inquiring about the "next move . . . in this process." Dr. Ehrlich responded to Dr. Simmons and the other committee members, "We will start working on an MOU based on the merger proposal." Dr. Ehrlich also suggested a "possible date for a conference call concerning the MOU."

The next month, Dr. Ehrlich sent Dr. Simmons an email, which was copied on the members of the joint merger committee, addressing what Dr. Ehrlich characterized as requirements for proceeding with a merger. The email was styled as a memo from Dr. Ehrlich to Dr. Simmons and read, in part, as follows:

> We have identified specific areas that are apparent roadblocks to the formulation of the MOU, a step mandatory to a merger. As it stands now, attorney preparation time, attorney review by both sides and other prudent and necessary details may make it impossible to meet the August 29 deadline. However, in our attempt to accommodate that date, we have summarized some of the data that is immediately required to allow our attorneys to begin this process.

The email went on to list the information and actions that Dr. Ehrlich claimed were required. This included information on the development and administration of ABCP's certification examination.

Approximately nine days later, Dr. Simmons responded with "as much of the information . . . as we have available for you at this time." His letter forwarding the available information also referenced the anticipated MOU:

> We hope this information submitted here is sufficient to assemble the MOU by your attorney so that we can move on with the next steps in this important process. We understand that after your attorney has reviewed the items supplied, additional information may be required by both ABCP and ABOP. We will do our best to provide this to you in a timely manner, as I am sure you will also do. Once all of the data is sufficiently collected,

3

please have the final MOU documents prepared by your attorney and send it to us so we can have our attorney review it and clarify any prudent and necessary details.

But Dr. Simmons's hope was not to be realized. Several days after receiving the information, Dr. Ehrlich emailed Dr. Simmons that, "due to the non[-]psychometrically supported nature of the ABCP exam process," ABOP could not "accept ABCP Diplomates directly as ABOP Diplomates." ABOP also found continuing with the merger "unacceptable" because it would undermine ABOP's efforts to seek certification with the American Board of Dental Specialties.

B.

ABCP sued, alleging that its acceptance of the terms of the July 14, 2014 email from ABOP's president, Dr. Ehrlich, formed a merger contract. ABCP explained that ABOP breached the contract because it had "secretly and improperly applied for membership and recognition" by the American Board of Dental Specialties. Once it was accepted for membership, ABOP determined that it no longer needed to merge. ABCP asked for specific performance of the merger in accordance with the terms of the July 14, 2014 email. ABCP also alleged that it had suffered damages as a result of ABOP's failure to close on the merger.

ABOP moved for summary judgment. It claimed that, from the beginning of the merger discussions, "the parties expressly acknowledged the requirement for attorneys to prepare and to reduce any agreement to a written Memorandum of Understanding (MOU), which contained all material points of the merger agreement." Because no MOU had been prepared or signed, ABOP argued that the complaint should be dismissed.

Alternatively, ABOP asserted that the negotiations between the two professional dental associations "never resulted in an agreement as to all essential material points." So ABCP's breach of contract claim failed because "there was never a meeting of the minds between the parties." ABOP claimed that, even if there were a meeting of the minds on some points, the alleged "offer" and "acceptance" relied on by ABCP were "not sufficiently definitive to form a binding agreement." Finally, ABOP argued that ABCP's request for specific performance should be denied "because the purported contract [wa]s not complete, specific, and certain and . . . [such] relief would not be equitable."

ABCP moved for partial summary judgment. As it had in its complaint, ABCP contended that the July 14, 2014 email was a legally enforceable offer with reasonably certain terms. And it claimed that it had unconditionally accepted the offer and its terms. So ABCP asked for a judgment that the proposal and acceptance created a legally enforceable contract, which ABOP breached when it refused to merge.

4

The chancery court granted ABOP's motion for summary judgment and dismissed the case with prejudice. The ruling focused on whether the necessary mutual assent for an enforceable contract existed. In concluding that mutual assent was lacking, the court described the July 14, 2014 email from Dr. Ehrlich as not "a proposed merger contract or an offer to merge but rather . . . further negotiations on the discussion items identified therein." In doing so, the court considered the language of Dr. Ehrlich's email but also both parties' references to the need for further negotiations after ABCP accepted the attached proposal. As the court explained, "the parties understood that attorneys would be involved in the process of the exchange of due diligence information and addressing the required legalities so as to address all material points between the parties for the creation of a legal merger." The negotiations between the parties terminated, however, prior to a final MOU being circulated.

Because there was no enforceable contract, the court concluded that specific performance was not an available remedy. But even if an enforceable contract existed, it determined that specific performance would be inequitable under the circumstances. The court also noted that "specific performance . . . would compel the cooperation of two antagonistic companies for the indefinite future."

## II.

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party moving for summary judgment has "the burden of persuading the court that no genuine and material factual issues exist and that it is, therefore, entitled to judgment as a matter of law." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If the moving party satisfies its burden, "the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Id.*

When considering cross-motions for summary judgment, the trial court "must rule on each party's motion on an individual and separate basis." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83 (Tenn. 2010). For the respective competing motions, the court must view the evidence in the light most favorable to the opposing party and draw all reasonable inferences in the opposing party's favor. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The court is not to "weigh" the evidence when evaluating a motion for summary judgment or substitute its judgment for that of the trier of fact. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84, 87 (Tenn. 2008); *Byrd*, 847 S.W.2d at 211. The denial of a cross-motion for summary judgment does not necessitate the granting of the competing cross-motion. *CAO Holdings, Inc.*, 333 S.W.3d at 83.

5

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin*, 271 S.W.3d at 84; *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. So we review the record de novo and make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763.

## A.

Here, the trial court granted summary judgment based on the lack of a valid and enforceable contract between ABCP and ABOP. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (recognizing "the existence of a valid and enforceable contract" as a necessary element of a breach of contract claim). To be valid and enforceable, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Johnson v. Cent. Nat. Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1962). The court concluded that there was no valid and enforceable contract here because there was no mutual assent.

An objective test is used to determine mutual assent. *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). We examine "the parties' objective manifestations, not their secret intentions," for the presence of assent. 1 WILLISTON ON CONTRACTS § 3:4 (4th ed., Westlaw (database updated Nov. 2020)); RESTATEMENT (SECOND) OF CONTRACTS § 18 cmt. a (AM. LAW INST. 1981) ("Assent to the formation of an informal contract is operative only to the extent that it is manifested."). But objective manifestations must be considered in light of the surrounding circumstances. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 879 (Tenn. 1991).

The circumstances surrounding the discussions between ABCP and ABOP show that the parties contemplated that a memorandum of understanding would be drafted to memorialize their agreement. Both Dr. Simmons and Dr. Ehrlich referenced the preparation of a memorandum of understanding even after the exchange of the emails that ABCP claims formed a binding contract. They also indicated that attorneys would be involved in the document's preparation.

Although the parties may have intended to memorialize their agreement with a memorandum of understanding, ABCP and ABOP could have reached an enforceable contract without one. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27 (AM. LAW INST. 1981) ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an

6

intention to prepare and adopt a written memorial thereof."). After all, "[p]arties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate [in the written instrument]." *Id.* § 27 cmt. a. So parties, either orally or through the exchange of writings such as emails, can form a binding contract that includes an obligation to sign a final writing that incorporates all agreed-upon terms. *Id.* To be binding, the parties must agree "'on all essential terms that are to be incorporated in the [final writing,]'" and the final writing must be "'understood to be a mere memorial of the agreement already reached.'" *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997) (quoting 1 ARTHUR L. CORBIN ET AL., CORBIN ON CONTRACTS § 2.8, at 133-34 (Rev. ed. 1993)). There is no binding contract "if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form." RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. b.

ABOP argues that the undisputed facts reveal one of those situations in which there could be no binding contract. According to ABOP, "[t]he parties . . . understood and expressly stated that any agreement would need to be reduced to another writing." *See id.* After its acceptance of the proposal, Dr. Simmons, on behalf of ABCP, wrote that he "suppose[d] that a Memorandum of Understanding or other document need[ed] to be constructed to consummate this merger of the ABOP and ABCP into one board."

ABCP counters that ABOP reads too much into Dr. Simmons's email accepting the proposal. ABCP suggests that Dr. Simmons's reference to the "Memorandum of Understanding or other document need[ed] . . . to consummate th[e] merger" was a reference to the "additional documentation to mechanically effect the actual merger." Specifically, according to ABCP, Dr. Simmons was referring to the articles of merger and agreement of merger that would be filed in the respective states of incorporation for ABCP and ABOP. *See* Cal. Corp. Code §§ 8011, 8019.1(b), (g) (West, Westlaw through Ch. 372 of 2020 Reg. Sess.) (requiring the board of each corporation that desires to merge to approve and file an agreement of merger); 805 Ill. Comp. Stat. Ann. 105/111.25 (West, Westlaw through P.A. 101-651) (requiring the filing of articles of merger). And those documents need only "include the material terms already agreed upon in [the July 14, 2014 email from Dr. Ehrlich]."

ABCP also claims that ABOP appreciated that any additional documentation created after ABCP's acceptance of the July 2014 proposal would be a mere memorial of the agreement already reached. In an email following ABCP's acceptance, Dr. Ehrlich wrote to ABOP's executive director that it was time to contact an attorney about preparing the memorandum of understanding. Dr. Ehrlich suggested that the attorney could "[u]se the template he likes the best." And the attorney should "[u]se the Merger Proposal (Attachment) as the primary guide, since it covers the points that we were most

7

concerned about." Dr. Ehrlich also expressed the opinion that "most of the MOU is legalese anyway."

Viewing the evidence in the light most favorable to ABCP and drawing all reasonable inferences in ABCP's favor, we conclude that ABCP knew that the agreement to merge was incomplete until it was reduced to another written form. We reach that conclusion based primarily on two factors. One is "the extent to which express agreement ha[d] been reached on all the terms to be included [in the merger agreement]." RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c. The "expression of the parties' intent to be bound[] and the definitiveness with which they state their terms" are related concepts. *Huber v. Calloway*, No. M2005-00897-COA-R3-CV, 2007 WL 2089753, at *3 (Tenn. Ct. App. July 12, 2007). Although for purposes of summary judgment we might accept ABCP's contention that the parties had agreed on a merger with ABOP to be the surviving entity,[1] the parties did not agree "that ABOP would absorb all of ABCP's assets and assume all of its liabilities." That might have been the case had the proposal been silent on the issues of assets and liabilities. *See* Cal. Corp. Code § 8020(a) (West, Westlaw through Ch. 372 of 2020 Reg. Sess.) (making surviving entity the successor to the property of the disappearing entity and subjecting the surviving entity to all debt of the disappearing entity); 805 Ill. Comp. Stat. Ann. 105/111.50(d), (e) (West, Westlaw through P.A. 101-651) (vesting surviving corporation with all property and making surviving corporation liable for all debt of merged corporation). Here, the ABOP proposal referenced specifically one asset, "[t]reasuries from both [b]oards," and provided that the asset would "be unified" upon completion of the merger. It is undisputed that there were other assets, namely intellectual property, and those assets were not specifically addressed in the proposal.

We cannot assume that the parties agreed that assets unaddressed in the proposal would be vested in the surviving entity. Dr. Simmons testified in his deposition that ABCP might retain its intellectual property after the merger. In his words, the proposal did not have to address the transfer of the intellectual property "because ABCP could remain a 501(c)(6) and just sit out there dormant." Dr. Simmons's testimony shows that the parties had not reached an agreement on an essential term of the merger, the disposition of the assets of the merging corporation.[2]

---

[1] ABOP's proposal did not designate a surviving entity following the merger, but it did provide that "ABOP will retain its name for the duration of the specialty application process" and that ABOP board members "will remain in place." Both terms permit the inference that ABOP intended that it would be the surviving entity of a merger.

[2] Dr. Simmons's testimony also shows that he did not appreciate the effect of merger. On the effective date of the merger, ABCP's separate existence would have ceased. *See* 805 Ill. Comp. Stat. Ann. 105/111.50(b) (providing that "[t]he separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease").

8

The second factor favoring an incomplete agreement is the parties' conduct following the purported merger agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c. ("[W]hether either party takes any action in preparation for performance during the negotiations" is "helpful in determining whether a contract has been concluded."). After ABCP claims the binding merger agreement was formed, Dr. Simmons received a request for information and for steps that Dr. Ehrlich claimed were required to overcome "roadblocks" to the merger. In that same communication, Dr. Ehrlich described the creation of a memorandum of understanding as "a step mandatory to a merger." Dr. Simmons did not object or insist that a merger agreement had already been reached. Instead, Dr. Simmons produced the requested information. ABCP describes Dr. Simmons's actions as merely "a show of good faith." But his email responding to the information request indicates otherwise. Dr. Simmons wrote of having ABCP's attorney review "the final MOU documents . . . and clarify any prudent and necessary details."

The undisputed evidence shows that ABCP knew that there would be no binding agreement until the whole had been reduced to a memorandum of understanding. Because a memorandum of understanding was never produced, the parties' objective manifestations show there was no mutual assent to an enforceable contract.

## B.

The trial court also concluded that specific performance was not a remedy available to ABCP. We agree. In Tennessee, "specific performance of a contract is not available to a party as a matter of right, but rests in the sound discretion of the [trial court] under the facts appearing in the particular case." *North v. Robinette*, 527 S.W.2d 95, 98 (Tenn. 1975). To order specific performance, "[t]he contract must be clear, definite, complete and free from any suspicion of fraud or unfairness." *Johnson v. Browder*, 207 S.W.2d 1, 3 (Tenn. 1947). As explained above, we do not find the purported contract between ABCP and ABOP to be complete.

## III.

Because the undisputed facts show the lack of mutual assent, there was no enforceable contract between ABCP and ABOP. So we affirm the grant of summary judgment to ABOP.

_____
W. NEAL MCBRAYER, JUDGE

9